**Daniel IOVIN, Plaintiff,**

v.

**NORTHWESTERN MEMORIAL HOSPITAL, an Illinois corporation, Defendant.**

**No. 94 C 4773.**

United States District Court, N.D. Illinois, Eastern Division.

March 5, 1996.

Gerald A. Goldman, Arthur R. Ehrlich, Jonathan C. Goldman, Law Offices of Gerald A. Goldman, Chartered, Chicago, IL, for Daniel Iovin.

Paul F. Gleeson, Randall Marc Lending, Vedder, Price, Kaufman & Kammholz, Chicago, IL, for Northwestern Memorial Hospital, an Illinois Corporation.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Plaintiff Daniel Iovin ("Iovin") sues defendant Northwestern Memorial Hospital ("NMH"), alleging national-origin discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* NMH's motion for summary judgment is presently before the Court. For the reasons set forth below, the motion is

granted and this action is dismissed with prejudice.

## RELEVANT FACTS

The following undisputed facts are gleaned from the parties' respective Local General Rule 12 statements of material facts and accompanying exhibits.[1] Iovin was born in Arad, Romania in 1957 and immigrated to the United States in 1980. (Def.'s Facts ¶¶ 7, 8). On April 12, 1993, he was hired as a senior systems analyst in NMH's Information Services Department ("IS") at an annual starting salary of $47,000. (*Id.* ¶¶ 1, 20). NMH is an academic medical center and is an Illinois corporation. (*Id.* ¶ 2). Iovin was initially interviewed and hired for the position by Debra Barford, manager of application systems in the IS department, and Leslie Purdy, director of application systems. (*Id.* ¶ 22). At the time that they made the decision to hire Iovin, both Barford and Purdy knew that he was of foreign descent. Barford specifically knew that he was Romanian. (*Id.* ¶ 23). In an affidavit submitted in opposition to NMH's motion, Iovin acknowledges that both Barford and Purdy were aware that he was of foreign descent, he adds, however, "My national origin was of great significance to them. I was hired to be the scapegoat for all problems that arose under Barford. I was hired by them because the fact that I was foreign made me more susceptible to manipulation." (Iovin Aff. ¶ 17).[2] Iovin also testified during his deposition that one reason Barford hired him may have been to get even with another employee (Scott Leslie) because she knew that Leslie did not like immigrants. (Def.'s Facts ¶¶ 58, 67); (Iovin Dep. at 565–66).

We shall detail Iovin's allegations momentarily; however, to provide a flavor of the nature of Iovin's charges, we note here that Iovin's complaint and submissions in opposi-

---

1. Local Rule 12(M)(3) requires a party moving for summary judgment to file "a statement of material facts as to which the moving party contends there is no genuine issue." The movant's statement must contain "specific references to affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth." NMH's statement shall be cited herein as "Def.'s Facts ¶___." Similarly, Local Rule 12(N)(3)(a) requires the non-moving party to file a concise response to the movant's statement including, in the case of any disagreement, specific references to supporting materials. Iovin's response shall be cited as "Pl.'s Facts ¶___." Pursuant to Local Rule 12(N)(3)(b), the nonmoving party may also submit a statement of "additional facts that require the denial of summary judgement," with respect to which the movant, in turn, may respond. Iovin's statement of additional facts shall be cited as "Pl.'s Add'l Facts ¶___" and NMH's response shall be cited as "Def.'s Resp. Add'l Facts ¶___." All properly supported material facts set forth in either party's statement (i.e., Def.'s Facts or Pl.'s Add'l Facts) are deemed admitted unless properly controverted by the statement of the opposing party. Local Rule 12(M) and 12(N)(3)(b); *see also Flaherty v. Gas Research Inst.,* 31 F.3d 451, 453 (7th Cir.1994); *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 921–22 (7th Cir.1994); *Stewart v. McGinnis,* 5 F.3d 1031 (7th Cir.1993), *cert. denied,* ___ U.S. ___, 114 S.Ct. 1075, 127 L.Ed.2d 393 (1994). Moreover, the mere denial of a particular fact without "specific references to the affidavits, parts of the record, and other supporting materials" that allegedly establish a factual dispute is insufficient; and, where a factual assertion is met with such a naked denial the fact may be deemed admitted. *Flaherty,* 31 F.3d at 453. Throughout his 12(N) response, Iovin cites solely to his own affidavit. The affidavit frequently contradicts Iovin's own earlier sworn deposition testimony in what appears to be an attempt to retract or explain away earlier statements. It is well-settled in this circuit that a party cannot "thwart the purpose of Rule 56 by creating issues of fact through affidavits that contradict their own depositions." *Darnell v. Target Stores,* 16 F.3d 174, 177 (7th Cir.1994) (quoting *Miller v. A.H. Robins Co.,* 766 F.2d 1102, 1105 (7th Cir.1985)); accord *Russell v. Acme-Evans Co.,* ADM, 51 F.3d 64, 67–68 (7th Cir.1995); *Babrocky v. Jewel Food Co.,* 773 F.2d 857, 861 (7th Cir.1985). Where depositions and affidavits conflict, the affidavit is to be disregarded unless it is demonstrable that the deposition testimony was mistaken. *Russell,* 51 F.3d at 67–68. Similarly, neither a statement in an affidavit that is highly unlikely considering the earlier testimony, *Unterreiner v. Volkswagen of Am. Inc.,* 8 F.3d 1206, 1210 (7th Cir.1993), nor an affidavit consisting of "bald assertions, entirely lacking in any recounting of specific facts such as required by Fed.R.Civ.P. 56(e)," *Babrocky,* 773 F.2d at 861, will create a triable issue of fact. *Id.*

2. This statement is a prototypic example of the "bald assertions, entirely lacking in any recounting of specific facts", *Babrocky,* 773 F.2d at 861, that pervade Iovin's affidavit. The Court will not pause throughout the opinion to note every instance of an unsupported factual assertion. Rather, we simply reiterate here that such assertions are insufficient to raise a genuine issue of material fact. *Id.*

tion to NMH's motion for summary judgment essentially allege that various employees at NMH—Iovin specifically identifies approximately 14 employees—and others engaged in a widespread conspiracy of discrimination against him. For example, among the individuals believed by Iovin to be embroiled in the conspiracy against him include: his two supervisors, co-workers, lower-level employees, the director of NMH's employee assistance program, the head of NMH's employee health services, his HMO physician, and his treating psychiatrist. Iovin contends that these individuals along with several accomplices who attempted to "cover up" the conspiracy, discriminated against him based on his national origin by creating a hostile work environment.[3] As just noted, Iovin claims that the very reason behind his supervisor's decision to hire him was to discriminate against him based on his national origin by assigning him to work with a co-worker who hated immigrants. (Def.'s Facts ¶ 58). Moreover, Iovin contends that the hostile work environment to which he was subjected was created and maintained by the conduct of such NMH employees as Nan Burgess, the head of NMH's employee health services, who contributed to the conspiracy of discrimination against him by not paying attention to him when he sought health services, by the tone and manner in which she spoke to him, and by throwing away his blood and stool specimens. (Def.'s Facts ¶ 168). Iovin also contends that Rick Derer, an independent consultant working with the IS department discriminated against him by asking such questions as "Hey Dan, how's it going, what's going on, how about that project"

and by trying to "cover up" the discrimination that was taking place. (*Id.* ¶ 193). Finally, Iovin believes that the physicians he has seen are involved in the conspiracy by virtue of the fact that they have not treated him fairly or by trying to show that his health had been degrading severely.[4] (*Id.* ¶ 199–203).

Iovin was assigned to work under Debra Barford ("Barford"), Manager of Application Systems, and her supervisor, Leslie Purdy ("Purdy"), a Director of Application Systems. (Def.'s Facts ¶¶ 20, 21). Both Barford and Purdy interviewed Iovin for the position of senior systems analyst. (Def.'s Facts ¶ 22). Central to his complaint, is the allegation that he was hired as a management trainee in a management-track position in the IS department at NMH. (Iovin Aff. ¶¶ 15, 16). Other than Iovin's testimony to this effect there is no evidence in the record to corroborate this contention. The NMH job advertisement to which Iovin responded, Iovin's offer of employment letter from NMH, and NMH's job description for a senior systems analyst are all devoid of any references to management training or that the position was a management-track position. (Def.'s Facts ¶¶ 32, 33). Moreover, NMH's assertion that the IS department does not have management trainees or management-track career positions is not controverted by Iovin. (*Id.* ¶ 39).[5] Iovin's assertion that he was hired into a management trainee position derives from his preemployment interview with Barford during which he related to her that he had an offer from another employer where he was told that he would be made a manager within 3 to 5 years. Iovin contends that Barford remarked "something to the effect of 'we will do it much quicker than that.'" (Iovin Aff. ¶ 15) However, in his

---

3. In view of the magnitude of deposition testimony and the multitude of accusations of discriminatory conduct contained therein, the Court shall not attempt to detail in this opinion each and every incident that Iovin mentioned during his deposition. However, in rendering its judgment, the Court has fully considered all of the evidence presented to the Court.

4. NMH has introduced some of Iovin's mental health records into the record in this case in

order, *inter alia*, to demonstrate that Iovin is paranoid and delusional. Indeed there is some support for this contention in the record. However, because it is unnecessary for purposes of resolving the present motion to delve into Iovin's psychiatric history, we need not detail the contents of those records.

5. Iovin's attempts to deny the statement by asserting that *he* was a management trainee in a management-track position. This is, of course, wholly insufficient.

deposition testimony, Iovin admitted that Barford never promised or guaranteed to make him a manager before 3 to 5 years.[6] (Iovin Dep. 205, 210). At most, Iovin's deposition testimony indicates that Barford indicated that her goals involved having Iovin help her with her administrative and managerial duties as soon as possible and that this was simply an objective that she was shooting for. (*Id.*) Similarly, in his follow-up interview with Purdy, Iovin admitted that Purdy never specifically stated to him that he was being hired for a management-track position or that he was a management trainee. (*Id.* 226–27).

Iovin was initially assigned to work on a number of projects, including two projects aimed at automating and updating NMH's billing process and forms (respectively known as the Electronic Data Interchange ["EDI"] project and the Universal Billing form project ["UB 92"]). (Def.'s Facts ¶¶ 24, 25). Both the EDI and the UB 92 projects were on the mainframe, which was an entirely new program for Iovin, whose computer experience dealt almost exclusively with mini-computers. (Def.'s Facts ¶¶ 17, 18, 26). Iovin devoted a good amount of time to learning the new programs and received several vendor demonstrations relating to the EDI project. (Def.'s Facts ¶ 79). Nevertheless, Iovin contends that his progress was impeded because the reference manuals he was given were outdated and obsolete. (Iovin Aff. ¶ 26).[7]

An element of Iovin's discrimination claim is that Barford did not provide him with the training and supervision that she indicated she would supply. Iovin contends that Barford promised she would provide such training in conjunction with her "promise" that he

would be on a management-track position and in view of the fact that his prior experience was primarily with mini-computers. (*See* Iovin Aff. ¶¶ 16, 25). Iovin maintains that instead of training him, Barford ignored him, claiming she was busy although she spent much of her time "chatting" with other employees. Iovin also maintains that Barford avoided him but went out of her way to speak to others. (*Id.* ¶ 23). In regard to Barford's availability to train Iovin, NMH notes, and Iovin does not controvert, that in June, 1993, NMH laid off several employees. Although Iovin himself was not laid off, six additional IS employees were assigned to Barford. (Def.'s Facts ¶ 72). As a result, Iovin spent less training time with Barford who occasionally directed him to other individuals for technical assistance. (Def.'s Facts ¶ 74).[8] Iovin does not controvert that after this influx of additional employees, the time Barford had to spend with any of the people under her was very limited. (*Id.* ¶ 72). In his deposition, Iovin testified that he was provided "positive assistance" from several co-workers, including technical and procedural assistance and questions about the EDI project. (Def.'s Facts ¶ 75; Iovin Dep. at 469–70). Although he does not dispute that others assisted him, in his affidavit, Iovin states that he only received a total of approximately six hours of training from his co-workers and that most of this time was consumed by efforts to straighten out a faulty software program that had been installed on his computer. (Iovin Aff. ¶ 24). Iovin admits that at Barford's suggestion, Iovin attended several seminars (one of which related to the UB 92 project) and received several vendor demonstrations relating to the EDI project. (Def.'s Facts ¶¶ 77–79). As one instance of discrimination, Iovin specifically cites the fact that he was

---

6. Thus, Iovin's assertion in his 12(N) statement that "the agreement to provide him with training to become a manager was orally promised by Barford at the Plaintiff's interview," (Pl.'s Facts ¶ 32) is flatly inconsistent with his earlier sworn deposition testimony.

7. There is no evidence in the record as to whether the manuals Iovin received were any different from those issued to other employees in the IS department.

8. Barford still engaged in some training of Iovin as is evidenced by a September, 1993, weekly status report to Barford, in which Iovin stated, "Debbie, thanks for taking the time last week (on September 1) to explain and clarify several things to me, related to procedures and policies particular to NMH. Your cooperation in this matter is greatly appreciated." (Pl.'s Ex. 23).

not permitted to attend a particular EDI seminar in May of 1993. The parties dispute the reason why Iovin was not permitted to attend this seminar. Barford and Purdy assert that they denied Iovin's request to attend based on budgetary constraints. (*See* Barford Aff. ¶ 19; Purdy Aff. ¶ 6). Barford also believed that Iovin could obtain the same information from the vendor demonstrations. (Barford Aff. ¶ 19). Iovin maintains that Barford specifically told him that money was not the reason that he was denied the EDI training. (Iovin Aff. ¶ 27). Iovin also notes that in the past two non-Romanian employees were permitted to attend the EDI training. (Pl.'s Facts ¶ 88).

Iovin asserts that Barford discriminated against him in myriad ways other than her failure to train him. Indeed, he testified that "everything Barford did ... was discrimination. Everything she said, everything she didn't say, everything she implied, everything she did or didn't do was discrimination." (Iovin Dep. at 780). According to Iovin, the fact that Barford hired him was predicated on a discriminatory intent—*viz.*, so that Barford could subject Scott Leslie to work with an immigrant and so that Barford could scapegoat Iovin. (Iovin Aff. ¶ 17; Iovin Dep. 565–66). Iovin also contends that Barford harassed him based on his national origin by "manipulating" him [9] and by once claiming that he did not understand "plain English." (Def.'s Facts ¶¶ 59, 60; Pl.'s Add'l Facts ¶ 6). And, Iovin complains that he was required to do more photocopying than anyone else. (Pl.'s Facts ¶ 100).

On October 27, 1993, Barford and Purdy met with Iovin. NMH characterizes the meeting as a six month review, whereas Iovin states that it was "supposed to be an initial PMP meeting where they would discuss the goals for the plaintiff." (Def.'s Facts ¶ 114;

Pl.'s Facts ¶ 114). In any event, there is no dispute that this meeting took place. At the meeting, Iovin was advised that he was being removed from the EDI and UB 92 projects and being reassigned to a laboratory support project where he was familiar with the system and software package. (Def.'s Facts ¶¶ 116, 129).[10] The reassignment did not affect Iovin's compensation, benefits, or job title. (Def.'s Facts ¶ 136). Iovin was advised that he was being removed from the projects for the following reasons: (1) to help him cope and recover from illness by relieving some stress; (2) because he was not up to speed on technical issues; and (3) because he didn't have friends. (*Id.* ¶ 131).

Iovin believes that he was removed from the projects because he was being scapegoated and as a product of discriminatory animus. (Pl.'s Facts ¶¶ 131, 132). Nevertheless, even before he received his six-month review, Iovin knew his performance was lacking with regard to the EDI and UB 92 projects. In a memo to Barford dated October 12, 1993, Iovin admitted his shortcomings with respect to the projects. (Iovin Dep. at 946). Likewise, in his deposition, Iovin admitted that Barford's assessment that he was "not up to speed on technical issues" necessary for the EDI and UB 92 projects was valid. (Def.'s Facts ¶ 121; Iovin Dep. at 671). Likewise, prior to his removal from the projects, Iovin agreed with Barford's five specific complaints about his performance. (Iovin Dep. at 946). These criticisms included the following: (1) he did not know the TSO environment; (2) it had taken him too long to learn the Timeline product; (3) he had a limited understanding of the terminology necessary for these projects; (4) his technical knowledge and experience on the mainframe and with the vari-

---

9. Iovin testified that while Barford manipulated "everybody," including her entire team, only her manipulative conduct towards him constituted discrimination. (Def.'s Facts ¶¶ 59, 61; Iovin Dep. at 782).

10. Barford attests that at this meeting she also advised Iovin that his work performance overall, and particularly with respect to his work on the EDI and UB 92 projects, was "unacceptable." (Def.'s Facts ¶ 114; Barford Aff. ¶ 28). On a

performance review form, Barford rated Iovin's performance as "unacceptable" in 11 out of 15 categories. (Def.'s Facts ¶ 115; Barford Aff. ¶ 28, Ex. C). Iovin maintains that he was never advised of these ratings and that he never received any documentation regarding the ratings. (Pl.'s Facts. ¶ 114). Iovin has made no effort, however, to controvert Barford's assertion that she rated his performance as she says she did or that such ratings accurately reflected her appraisal of Iovin's performance.

ous software packages he was expected to use such as TSO, Panvalet and CICS were limited and therefore he had to "depend greatly on others:" and (5) he had difficulty in properly maintaining Gant Charts/spreadsheets for the UB 92 project. (Def.'s Facts ¶ 118; Iovin Dep. at 946–47).

Some of Iovin's more egregious allegations of discrimination concern a co-worker named Scott Leslie ("Leslie"). Soon after Iovin began working at NMH, Leslie allegedly began harassing Iovin by making generally derogatory remarks to Iovin. Two of Leslie's remarks specifically referred to Iovin's national origin. (Def.'s Facts ¶¶ 42, 43). First, on or about September 2, 1993, Leslie said to Iovin, "I don't like immigrants and I'm against immigrants. I'm against a lot of warm bodies that they keep bringing here from other countries while at the same time there are a lot of qualified U.S. citizens and Americans who are laid off and lose their jobs because of warm bodies who accept being paid dirt cheap." (Iovin Dep. at 315). The second allegedly derogatory remark made by Leslie occurred on October 27, 1993, prior to Iovin's performance review that day. (Iovin Dep. at 631). Iovin testified that he overheard Leslie state to several co-workers: "I don't understand these things—there is a friend of mine who was telling me about these immigrants." Iovin testified that Leslie then "generally . . . got into saying about how . . . immigrants are coming to this country and accept dirt pay and take away the jobs from well qualified and educated Americans, and he concluded by saying something about NAFTA." (Iovin Dep. at 632).[11]

On September 22, 1993, Iovin met with Krista Bremberg and Shawn Williams of NMH's Human Resources Department and told them that he was unhappy with his job situation. Iovin complained not about Leslie's conduct, but rather about his supervisor Barford whom he felt was "making the rounds and not talking to [him] but to everybody else on the team." (Iovin Dep. at 573). Iovin specifically admits that he did not advise Bremberg and Williams that Leslie had made a remark about immigrants and explains that this was because they never asked. (Pl.'s Facts ¶ 149). Bremberg and Williams asked Iovin if he wanted to switch managers, Iovin replied that he hadn't thought about it. (Def.'s Facts ¶¶ 149, 150; Iovin Dep. at 579).

Although Iovin testified that he had complained about derogatory remarks regarding immigrants to several people (including Purdy, human resource personnel, and to nurses), Iovin testified that he did not divulge Leslie's name or any of the specifics until October 27, 1993, during his meeting with Barford and Purdy.[12] (Iovin Dep. at 323, 567). After listening to Iovin's complaint, Purdy responded by telling Iovin that "we don't tolerate that kind of stuff around here. I'm sorry." (Iovin Dep. at 641–42). Purdy then instructed Iovin that if he "should ever hear such comments again to let her know." (*Id.*). On either the same day or the next, Purdy met with Scott Leslie and advised him that a co-worker had made a complaint to management alleging that he had been making unfriendly remarks about immigrants and advised him to cease from such conduct immediately. (Def.'s Facts ¶ 44). On November 3, 1993, Barford met with Leslie and issued him a written warning stating:

> Recently, another member of the Application Support Team has made written allegations to Human Resources and IS Management that they have been subject to

---

**11.** In addition to the foregoing comments regarding national origin, Iovin claims that Leslie also "expressed his feelings about why I shouldn't really be [at NMH]." (Iovin Dep. at 327). On September 21, 1993, Iovin claims that Leslie laughed at him, implied that he was stupid and asked him why he was still working at NMH. (Pl.'s Add'l Facts ¶ 4). Iovin claims that Leslie's harassment also consisted of comments such as "Why are you wasting your time here?"; comments suggesting that Iovin was not "productive," suggesting that he was being overpaid, and suggesting that he was stupid and comments making "an inference" that Iovin was "dead wood." (Def.'s Facts ¶ 51). Leslie also allegedly told Iovin that he earned his pay by putting fresh paper in the printer. (Pl.'s Add'l Facts ¶ 2). In his deposition, Iovin also testified that Leslie did not acknowledge his greetings in the morning and generally looked down on him. (Iovin Dep. at 440, 568).

**12.** Iovin testified that the reason he did not divulge Leslie's name to management was because no one ever asked. (Iovin Dep. at 323).

harassment from you by repeated remarks you have made, both to this person and to others in this person's presence. The remarks have been described as ethnic slurs. This person has also alleged that you have repeatedly referred to their technical abilities in a denigrating manner on an ongoing basis.

NMH policies protect all employees in the workplace against discrimination and harassment in any form on the basis of national origin, religion, gender, or any other personal attributes. All allegations of this sort are taken seriously as a possible violation of this policy. You are hereby advised that, if these allegations are correct, any and all activity of this sort on your part will not be tolerated and must stop immediately. Any further allegations of the type of behavior will result in suspension pending investigation and, if substantiated, will be grounds for immediate termination of your employment.

(Def.'s Facts ¶ 46).[13] Moreover, NMH began an investigation into Iovin's allegations against Leslie. However, it was never completed due to Iovin's subsequent leave of absence on November 12, 1993, and eventual termination from NMH. (Barford Aff. ¶ 39).

One final allegation concerning discriminatory conduct bears mention. Iovin complains that on November 2, 1993, Barford requested him to submit himself for an employee health examination. (Def.'s Facts ¶ 139). Barford attested that NMH encourages its managers to request an employee health evaluation for employees who are not functioning effectively and who appear ill. (Id. ¶ 140). She requested Iovin to submit to a health exam because (1) he was continuing to take a lot of time off while showing little improvement; (2) the quality of his work was deteriorating

greatly and his participation in meetings was becoming less productive; (3) he was focussing on insignificant points and becoming confused; (4) he had published minutes to a meeting that were disorganized and inaccurate; (5) his inability to concentrate and his discussions regarding his stress had taken away significant time from other employees; (6) another employee had expressed concern about Iovin's health; (7) Iovin had requested to work at home because the stress of working in the office was affecting him greatly. (Barford Aff. ¶ 42). In the past, Barford requested a non-Romanian employee to submit for a health examination.[14] (Id. ¶ 141).

## DISCUSSION

### Summary Judgment Standards

■■■■ Summary judgment is proper only if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue for trial exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Materiality [15] is determined by assessing whether the fact in dispute, if proven, would satisfy a legal element under the theory alleged or otherwise affect the outcome of the case. *Id.* at 247, 106 S.Ct. at 2509. The court must view all evidence in a light most favorable to the nonmoving party, *Sample v. Aldi Inc.*, 61 F.3d 544, 546 (7th Cir.1995), and draw all inferences in the non-movant's favor. *Santiago v. Lane*, 894 F.2d 218, 221 (7th Cir.1990). However, if the evidence is merely colorable, or is not signifi-

---

13. Additionally, Shawn Williams, NMH's former human resources consultant, met individually with Scott Leslie and advised him that if he was making derogatory comments about immigrants, his behavior was inappropriate and his conduct should cease immediately. (Def.'s Facts at 47). In his deposition testimony, Iovin stated that he believes that the Human Resources personnel, namely Williams and Bremberg, discriminated against him based on his national origin by not doing anything to remedy his situation. (Def.'s Facts ¶ 146; Iovin Dep. at 592–97).

14. Iovin notes that this employee was drinking on the job, was often visibly intoxicated, and threatened to kill himself and Leslie Purdy. (Pl.'s Facts ¶ 141).

15. "The substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Liberty Lobby*, 477 U.S. at 247, 106 S.Ct. at 2509. Factual disputes that are irrelevant or unnecessary are not material. *Id.*

cantly probative or merely raises "some metaphysical doubt as to the material facts," summary judgment may be granted. *Liberty Lobby*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Flip Side Productions, Inc. v. Jam Productions, Ltd.*, 843 F.2d 1024, 1032 (7th Cir.), *cert. denied*, 488 U.S. 909, 109 S.Ct. 261, 102 L.Ed.2d 249 (1988). In making its determination, the court's sole function is to determine whether sufficient evidence exists to support a verdict in the nonmovant's favor. Credibility determinations, weighing evidence, and drawing reasonable inferences are jury functions, not those of a judge when deciding a motion for summary judgment. *Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. at 2513. Finally, we note that mere conclusory assertions, unsupported by specific facts, made in affidavits opposing a motion for summary judgment are not sufficient to defeat a proper motion for summary judgment. *See Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 3188, 111 L.Ed.2d 695 (1990) ("The object of [Rule 56(e) ] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit.") *First Commodity Traders, Inc. v. Heinold Commodities, Inc.*, 766 F.2d 1007, 1011 (7th Cir.1985) ("Conclusory statements in affidavits opposing a motion for summary judgment are not sufficient to raise a genuine issue of material fact").

### 1. *Iovin's Disparate Treatment Claims*

Iovin maintains that he was discriminated against on the basis of his national origin when NMH denied him training, gave him low performance ratings, and removed him from projects. *See* Pl.'s Resp. at 6. In this regard Iovin purports to state a disparate treatment claim. Iovin's ultimate burden with respect to this claim is to establish that NMH intentionally discriminated against him on the basis of his national origin. To satisfy this burden, Iovin has two

options: (1) he may present direct evidence of discrimination such as a direct acknowledgment of discriminatory intent, or (2) he may present circumstantial evidence of discrimination. *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir.1994). Perhaps the most common method of proving employment discrimination circumstantially is through resort to the indirect, burden-shifting method of proof articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[16]

Under the *McDonnell Douglas* approach, the plaintiff may establish a prima facie case of discrimination by demonstrating that he or she: (1) is a member of a protected class; (2) is qualified for the job in question or is meeting the legitimate expectations of the employer; (3) suffered an adverse employment action; and (4) the employer treated similarly situated persons not in the protected class more favorably. *See, e.g., Bratton v. Roadway Package Sys., Inc.*, 77 F.3d 168, 175 (7th Cir.1996); *EEOC v. Our Lady of the Resurrection Med. Ctr.*, 77 F.3d 145, 148 (7th Cir.1996); *Taylor v. Canteen Corp.*, 69 F.3d 773, 779 (7th Cir.1995); *Sample v. Aldi Inc.*, 61 F.3d 544, 548 (7th Cir. 1995). If the plaintiff succeeds in making a prima facie showing of discrimination, a rebuttable presumption of discrimination arises and the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory justification for its action. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981); *Our Lady*, 77 F.3d at 148; *Sample*, 61 F.3d at 547. To meet this burden, the defendant must produce evidence "which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509, 113 S.Ct. 2742, 2748, 125 L.Ed.2d 407 (1993). If the defendant articulates such a justification, the presumption drops out of the case and the burden shifts back to the plaintiff to

**16.** As explained in *Troupe,* other methods of proving discrimination circumstantially include presenting evidence of "suspicious timing, ambiguous statements oral or written, behavior towards or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn," 20 F.3d at 736, and presenting evidence "whether or not rigorously statistical, that employees similarly situated to the plaintiff ... received systematically better treatment." *Id.*

prove that the proffered reasons were a pretext for discrimination. *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. Pretext may be shown by establishing one of the following: (1) the defendant employer's explanation had no basis in fact; or (2) the explanation was not the "real" reason; or (3) the reason stated was insufficient to warrant the adverse employment action. *Collier v. Budd Co.,* 66 F.3d 886, 892 (7th Cir.1995). The plaintiff always retains the ultimate burden of proving that he or she was the victim of intentional discrimination. *Hicks,* 509 U.S. at 506–07, 113 S.Ct. at 2747.

Iovin's evidentiary showing with respect to his disparate treatment claims is insufficient and NMH is entitled to judgment as a matter of law on those claims. We shall consider his disparate treatment claims individually.

### 1. *Iovin's Removal from Certain Projects*

■ Iovin complains that he was discriminated against on the basis of national origin when Barford and Purdy removed him from the EDI project and the UB 92 project. As a threshold matter, it is far from clear that this allegation can support a Title VII claim. There is no evidence in the record that Iovin was entitled to work on any particular project. The record reflects that he was hired into a position, not a project. And, the decision to place him on one or another project rested in the discretion of his supervisors. Furthermore, when Iovin was removed from the EDI and UB 92 projects and transferred to the lab support project, his compensation, benefits, and job title remained unchanged. (Def.'s Facts ¶ 136). As the Seventh Circuit has explained in the context of the ADEA, while employment actions that fall short of actual termination may be actionable, a plaintiff "does not establish a prima facie case by showing only that a job transfer would cause . . . altered job responsibilities." *Flaherty v. Gas Research Institute,* 31 F.3d 451, 456 (7th Cir.1994). The court continued, "the ADEA prohibits age discrimination, 'not changes in duties or job conditions that cause no materially significant disadvantage to an older em-

ployee.'" *Id.* (quoting *Crady v. Liberty Nat'l Bank and Trust Co.,* 993 F.2d 132, 136 (7th Cir.1993)). Iovin's allegations concerning his removal from the EDI and UB 92 projects fall squarely within the scope of this language. Although the *Flaherty* court emphasized that "an employer does not insulate itself from liability for discrimination simply by offering a transfer at the same salary and benefits," *id.* at 456–57, the instant record is completely devoid of any evidence suggesting that Iovin's transfer to the lab support project was predicated on discriminatory animus and reflected an effort to marginalize or isolate him.

More importantly, even if Iovin's transfer is deemed to constitute an actionable employment decision, the record firmly establishes that Iovin cannot establish a prima facie case of discrimination. In particular, he cannot establish that he was meeting the legitimate expectations of his employer in view of his admissions that virtually all of Barford's criticisms of his performance on the EDI and UB 92 projects were "valid" and "fair," Pl.'s Facts ¶ 119, and that he had "shortcomings" in each of the areas Barford had criticized him, *id.* ¶ 120, and that he was not "up to speed on the technical issues," *id.* ¶ 121.[17] Nor has Iovin made any showing that non-Romanian employees, similarly situated in terms of their performance were retained on projects. Accordingly, we find that Iovin has failed to establish a prima facie showing of national origin discrimination based on his removal from the EDI and UB 92 projects.

■ We also note at this juncture that the same decision-makers that hired Iovin (Barford and Purdy) are the decision-makers that are alleged to have discriminated against Iovin by taking him off the EDI and UB 92 projects. The Seventh Circuit has noted on several occasions that where the same decision-maker that hired the plaintiff is also alleged to be the discriminator, an inference of nondiscrimination arises. *See EEOC v. Our Lady of the Resurrection Med. Ctr.,* 77 F.3d 145 (7th Cir.1996) (noting that the "same hirer/firer inference has strong

---

**17.** In view of Iovin's admissions concerning his performance, we also conclude that NMH is entitled to summary judgment on Iovin's claim that

NMH discriminated against him by giving him low performance ratings. Accordingly, the Court shall discuss this claim no further.

presumptive value"); *see also Rand v. CF Indus., Inc.*, 42 F.3d 1139 (7th Cir.1994) (noting in an age discrimination case that, where the plaintiff was hired and fired by the same person within a 2 year period, "[i]t seems rather suspect to claim that the company that hired him at 47 had suddenly developed an aversion to older people two years later.") (internal quotation marks omitted). Here Iovin maintains that Barford hired him and almost immediately began discriminating against him. Under the facts of this case, the Court must take into consideration the "same hirer/firer inference" in evaluating Iovin's claims of discrimination.

### 2. *Failure to train*

■ Iovin also complains that he was discriminated against on the basis of national origin when he was denied permission to attend an EDI training seminar in May of 1993, which would have been approximately one month after he was hired. At the outset, the Court notes again that it has grave doubts that this claim even presents an actionable Title VII claim. As Magistrate Judge Rosemond recently stated in *Berggruen v. Caterpillar, Inc.*, 1995 U.S. Dist. Lexis 1870, *16 (N.D.Ill. February 15, 1995), *adopted in part and rejected in part*, 1995 WL 382500 (N.D.Ill.1995) (Castillo, J.), "[e]mployers are not required to grant every employee's request for training." Certainly, there may be cases in which access to training opportunities is so intimately interconnected with promotional opportunities that a failure to provide access to training opportunities is tantamount to a failure to provide advancement opportunities. But, the record does not indicate that this case falls in that category. Rather, Iovin complains about the denial of his request to attend a specific training seminar early in the course of his employment and there is no evidence in the record suggesting that Iovin's failure to attend this seminar was a significant factor in his ultimate job performance at NMH. Additionally, the record reveals that Iovin was given the opportunity to attend several other training seminars and vendor demonstrations. Pl.'s Facts ¶ 77–79.

In any event, once again Iovin is unable to establish a prima facie case of discrimination. Iovin has adduced no evidence indicating that similarly situated employees, not in the protected class, were treated more favorably with respect to their ability to attend training seminars. In an effort to establish a prima facie showing, Iovin attests that two non-Romanian employees (Bill Walton and Jerry Susmarski) had both been allowed to attend the same seminar that he was denied permission to attend. Iovin Aff. ¶ 27. However, the record reflects that Walton left NMH approximately 4 months before Iovin started working there and couldn't possibly have attended the May 1993 seminar. (*See* Def.'s Facts, Ex. K). Similarly, Jerry Susmarski attested that neither he nor Walton attended the May 1993 EDI seminar. (Susmarski Aff. ¶ 4).[18] Moreover, Susmarski's affidavit indicates that in May of 1993 he would have been employed at NMH for approximately 15 years. In sharp contrast, Iovin would have been employed approximately one month. Plainly, the continuing education opportunities that an employer might make available to a fifteen year veteran may legitimately differ from those made available to a one-month employee. Put in the language of the prima facie showing, Iovin has presented absolutely no evidence that Walton and Susmarski were similarly situated employees. Finally, Iovin has presented absolutely no evidence that Barford's reason for denying Iovin's request—*viz.*, that the seminar was unnecessary because Iovin could get the same information directly from the EDI vendor—was a pretext for discrimination.

■ Although it not entirely clear from Iovin's submissions, Iovin may also be claiming that Barford discriminated against him more generally with respect to training by failing to give him the time and attention she allegedly promised him pursuant to her al-

**18.** Even if Iovin's affidavit is construed as stating that at some point in the past, Walton and Susmarski were permitted to attend an EDI seminar whereas he was not, Iovin has still not met his burden. Susmarski's affidavit reveals that the EDI seminar that he attended in 1992 was a one-day seminar unlike the May 1993 seminar which was a three-day seminar. Thus, Iovin is asking the Court to compare apples and oranges.

leged promise to put Iovin into a management track position. This theme pervades Iovin's submissions to the Court. However, the extent, if any, to which Iovin relies on this as the basis for his disparate treatment claim is unclear. Nevertheless, we will address it here because extended discussion of this claim is unnecessary. Simply put, there is no probative evidence in the record that Barford treated Iovin any worse in this regard than any other employee. Regardless of what Barford may or may not have promised Iovin, the only relevant inquiry under Title VII is whether Barford intentionally discriminated against Iovin on the basis of his national origin. Thus, while Barford may have fallen short of providing Iovin with the training that she promised him, that is not particularly illuminating as to the real inquiry. Absent evidence that Barford treated non-Romanian employees more favorably with respect to giving them training and assistance, Iovin simply cannot prevail on a Title VII claim. Although Iovin maintains that Barford "spent much of her time in her office chatting away with Laverne Kocal, Susan Geraty and others," (Pl.'s Fact ¶ 23), the only evidence bearing on whether Barford afforded non-Romanians a greater amount of personal training, is his remark that "Barford spent a lot of time giving specific instructions to Susan Geraty (non-Romanian) even though Geraty was not on Barford's team." (*Id.* ¶ 25). This lone assertion is insufficient to raise a genuine issue of material fact as to whether Barford treated non-Romanians more favorably.

The uncontroverted record in this case is that shortly after Iovin was hired, there was a layoff and restructuring that Iovin survived. The restructuring resulted in additional employees being assigned to work under Barford. She also inherited additional duties and, as a result, the time she had to spend with the individuals reporting to her was very limited. Iovin admits this fact. (Pl.'s Facts ¶¶ 72, 73). On occasion, Barford directed Iovin to other individuals for assistance. (*Id.* ¶ 74). And, although he now minimizes their assistance, Iovin does not dispute that he was assisted by several of his co-workers. (Iovin Dep. at 469–71; Pl.'s Facts ¶ 75; Iovin Aff. ¶ 24). Most signifi-

cantly, there is not a shred of probative evidence that Barford provided a greater amount of training to the non-Romanian employees working under her. The fact that she may have spent a lot of time giving specific instructions to an employee who did not even work under her simply is not probative as to whether Iovin was receiving less supervisory training or assistance than his co-workers. Indeed, if Barford was spending her time with an employee who was not from her own team, all of the employees on her team (Romanian and non-Romanian) were equally deprived of her accessibility. In short, this Court has neither the inclination nor the authority to sit over Barford's shoulder instructing her how to spend her time so long as we are satisfied that she is not impermissibly discriminating against those she oversees. For all of these reasons, NMH is entitled to judgment as a matter of law on Iovin's claim that Barford failed to provide training to Iovin.

■ Iovin also contends that Barford's action in requesting him to submit to a health examination was motivated by discriminatory animus. However, the record is clear that Iovin was manifesting signs of stress, including requesting to work at home because the stress of working in the office was affecting him greatly. Def.'s Facts ¶ 142. Iovin has made no showing to rebut NMH's legitimate, nondiscriminatory justification for asking him to submit to an examination. And, Iovin does not controvert the fact that NMH encourages its managers to request an employee health evaluation for employees who are not functioning effectively and who appear ill. Accordingly, NMH is entitled to judgment as a matter of law on Iovin's Title VII claim to the extent that it is predicated on Barford's request that he submit to an examination.

Finally, we expressly note that although for purposes of comprehensiveness we have separately reviewed each of Iovin's claims of discriminatory treatment, the Court's evaluation of Iovin's claims does not change when all of the claims are evaluated together. This is especially true in light of the Court's application of the "hirer/firer inference" of nondiscrimination to the facts of this case. Accordingly, NMH is granted summary

judgment with respect to Iovin's disparate treatment claims.

## 2. *Hostile Work Environment*

Iovin also purports to assert a hostile work environment claim. As the Supreme Court recognized in *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), Title VII claims are not limited to economic discrimination, but rather Title VII "strike[s] at the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." *Id.* at 64, 106 S.Ct. at 2404. While *Meritor* involved sexual harassment, the doctrine applies equally to claims of harassment based on race, religion, or national origin. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, ———— ————, 114 S.Ct. 367, 370–71, 126 L.Ed.2d 295 (1993). Allegedly harassing conduct is actionable under Title VII where "the conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Meritor*, 477 U.S. at 64, 106 S.Ct. at 2404. Iovin maintains that he was subject to a hostile work environment based on Barford's failure to train him as promised, the fact that she ignored him and made him do an inordinate amount of copying, her comment about his inability to understand plain English, and the fact that she removed him from the EDI and UB 92 projects. Additionally, Iovin claims that Scott Leslie contributed to the hostile environment and that NMH did nothing about it even though he complained.

In considering Iovin's hostile work environment claim, the Court must first consider whether Iovin was subjected to such hostile, intimidating or degrading behavior as to adversely affect the conditions under which he worked. In answering this question, it is important to remember that not all conduct that is offensive can be characterized as harassment in violation of Title VII. Rather, it is only "[w]hen the workplace is so permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' that Title VII is violated." *Harris*, 510 U.S. at ———, 114 S.Ct. at 370 (quoting *Meritor*, 477 U.S. at 65, 67, 106 S.Ct. at 2404, 2405).

Determining whether an environment is "hostile" is not, and cannot be, a mathematically precise test. *Harris*, ——— U.S. at ———, 114 S.Ct. at 371. As the Seventh Circuit recently noted: "To determine whether the plaintiff's work environment is hostile within the meaning of Title VII, we consider a variety of factors, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 534 (7th Cir.1993) (quoting *Harris*, 510 U.S. at ———, 114 S.Ct. at 371 (1993)). The inquiry focuses on the totality of the circumstances and no single factor is required or determinative. *Id.* Finally, in judging the nature of the conduct at issue, both an objective and subjective standard is used. In other words, the court considers both the actual impact on the plaintiff as a result of the conduct as well as the impact such conduct would have on a reasonable person in the plaintiff's position. As the Court in *Harris* stated:

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is not a Title VII violation.

*Harris*, 510 U.S. at ———, 114 S.Ct. at 370. With these standards in mind, we turn to consider Iovin's hostile work environment claims.

Insofar as Iovin's claims are based on Barford's alleged conduct, we will not repeat the ground we have already covered, suffice it to say that the record is devoid of any probative evidence to support the conclusion that any of Barford's conduct was motivated by dis-

criminatory animus. We pause here to add a few additional comments more appropriate to Iovin's hostile environment claims. First, with respect to Iovin's claims regarding Barford's treatment of him, it is important to note that Iovin has testified (and admitted in his 12(N) statement) that Barford "manipulated" everybody, including "her entire team." (Pl.'s Facts ¶¶ 61–66). Thus, by Iovin's own account Barford's conduct was not directed solely at him, and thus his charge of national origin discrimination is completely undermined. Additionally, Iovin's alleged inability to receive direct training from Barford, while perhaps frustrating, cannot be considered sufficient to constitute a hostile work environment. *See Saxton*, 10 F.3d at 535 (supervisor's inaccessibility, condescension, impatience, and teasing not harassment). With regard to Iovin's allegation that he was required to do a disproportionate amount of copying in comparison to other employees, Iovin offers no evidence as to the amount of copying other co-employees were required to do. Moreover, it is evident that it was not an irregular task to spend some time copying documents. In Iovin's case, during his seven months of employment with NMH he copied in total three to four documents of 400 to 500 pages each; two documents of 200 pages and a dozen shorter documents. (Def.'s Facts ¶ 101). This Court finds that this required copying task was not so severe as to constitute a hostile work environment.

■ Iovin also points to two comments made by Barford as evidence of her discriminatory animus. In the first, Barford accused Iovin of not understanding plain English; in the second, Barford allegedly told him, "Why don't you go back where you came from if you don't like it here." (Iovin Dep. at 562). Even if the Court reads these comments in the light most favorable to Iovin as reflecting national origin animus,[19] they cannot support a hostile environment claim because Barford's alleged conduct, when viewed in its totality, does not rise to a sufficient level of severity or pervasiveness to objectively alter Iovin's conditions of employment. " '[M]ere utterance of an ... epithet which engenders offensive feelings in an employee,' does not sufficiently affect conditions of employment to implicate Title VII." *Harris*, —— U.S. at ——, 114 S.Ct. at 370 (quoting *Meritor*, 477 U.S. at 67, 106 S.Ct. at 2405).

■ The most serious conduct raised by Iovin as evidence of a hostile work environment consists of derogatory remarks about immigrants as well as generally rude conduct by Scott Leslie, a co-employee. Leslie's alleged remarks are extremely troubling and offensive to most informed citizens in our cherished country of immigrants. However, in order for NMH to be liable for the discriminatory conduct by a co-worker, Iovin must demonstrate that NMH's response or lack thereof to Leslie's harassing behavior was negligent. *Carr v. Allison Gas Turbine Div., General Motors Corp.*, 32 F.3d 1007, 1009 (7th Cir.1994); *Guess v. Bethlehem Steel Corp.*, 913 F.2d 463, 465 (7th Cir.1990). NMH argues that it took prompt remedial action to remedy Scott Leslie's conduct once it learned of the situation. We agree.

Iovin's own testimony establishes that although he was aware of NMH's policy against discrimination and harassment, he

---

**19.** In this regard the Court notes that Barford made the "plain English" comment on September 29, 1993, after reminding Iovin of a meeting he was scheduled to attend. Iovin claims Barford remarked to him, "See, even from this incident I can tell you can't concentrate and you don't understand plain English." It is far from clear that the comment reflects any national origin animus. The expression "Don't you understand plain English" is about as common a reproach for one's failure to follow directions as there is in the vernacular. And, few people would seriously maintain that it reflects national origin animus. However, for purposes of deciding this motion we shall grant Iovin the benefit of the doubt. However, we do note that in the disparate treatment context, the Seventh Circuit has stated that "[r]emarks at work that are based on stereotypes of an individual's national origin do not invariably prove that national origin played a part in an employment decision; the plaintiff must show that the [employer] relied on this impermissible criterion in making its decision." *Hong v. Children's Memorial Hosp.*, 993 F.2d 1257, 1265 (7th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1372, 128 L.Ed.2d 48 (1994). In the instant case, there is no evidence connecting the alleged comments to any employment decisions and they are, at best, regarded as stray remarks, which do not, standing alone, create a triable issue.

did not specifically inform his immediate supervisor, Barford, that Leslie had made derogatory remarks to him until October 27, 1993.[20] Once informed of Leslie's alleged comments, Purdy told Iovin that "we don't tolerate that kind of thing here, not at NMH." Purdy then met with Scott Leslie and advised him that a co-worker had complained to management that he had been making unfriendly remarks about immigrants and warned him that, if true, such conduct was inappropriate and must cease immediately. (Purdy Aff. ¶ 11). On November 3, 1993, Barford met with Leslie and issued a written warning to him that explicitly detailed NMH's policy against discrimination and harassment and warned Leslie that such conduct was grounds for immediate termination. A few days after Iovin's complaint, on November 3, 1993, Iovin's work station was moved away from that of Leslie. Under these facts, there is no basis upon which a jury could conclude that NMH did not take prompt and appropriate measures to remedy Leslie's conduct once it received proper notice of that conduct. Accordingly, a reasonable factfinder could not find NMH liable for Leslie's alleged harassment of Iovin.

The Court has closely reviewed all of Iovin's evidence concerning the conduct to which he was allegedly subjected. Based on its review of the evidence, the Court concludes that a reasonable factfinder could not find that Iovin's working conditions constituted an objectively hostile or abusive work environment. Accordingly, NMH is entitled to judgment as a matter of law on Iovin's hostile work environment claims.

*CONCLUSION*

This Court does not doubt that Mr. Iovin subjectively believes that he has been the subject of discriminatory animus in the workplace. However, such a subjective belief, without much more does not entitle Mr. Iovin to a jury trial on his claims. The strongest evidence of discrimination offered by Mr.

Iovin is the hostile statements by his co-worker Scott Leslie. These statements, however, as noted herein do not automatically bind NMH.

Based on the Court's careful review of the record in this case, we conclude that a reasonable factfinder could not return a verdict in Mr. Iovin's favor on either his disparate treatment claim or his national origin harassment claim. Accordingly, NMH's motion for summary judgment is granted and this case is dismissed with prejudice, both sides to bear their own costs.

---

20. Iovin tries to raise a genuine issue of material fact by asserting that he complained of discriminatory conduct as early as April of 1993. However, the undisputed record is that Iovin never specifically identified who was harassing him until October of 1993 and we decline to hold that an employee puts his employer on adequate notice by simply complaining that he is being subjected to discriminatory conduct by some unspecified coworker.