Thomas FLAHERTY, Plaintiff–Appellant,

v.

GAS RESEARCH INSTITUTE, Defendant–Appellee.

No. 93–3651.

United States Court of Appeals, Seventh Circuit.

Argued April 7, 1994.

Decided July 28, 1994.

**452**

Roy P. Olson (argued), Friedman & Olson, Chicago, IL, for plaintiff-appellant.

Ralph A. Morris (argued), David L. Miller, Brittain, Sledz, Morris & Slovak, Thomas C. O'Laughlin, Gas Research Institute, Chicago, IL, for defendant-appellee.

Before FLAUM and ROVNER, Circuit Judges, and CRABB, District Judge.[*]

ILANA DIAMOND ROVNER, Circuit Judge.

Thomas Flaherty maintains that the Gas Research Institute ("GRI") violated the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–634, when it terminated his employment. Flaherty contends that his age was a determining factor in GRI's decision and that GRI was retaliating against him for suggesting to another employee that the company may be discriminating on the basis of age. The district court granted GRI's motion for summary judgment, finding that Flaherty had not suffered an "adverse employment action" under the ADEA because prior to his termination, the company had offered Flah-

---

[*] The Hon. Barbara B. Crabb, Chief Judge of the United States District Court for the Western District of Wisconsin, sitting by designation.

erty a lateral transfer at the same salary and benefits and with comparable responsibilities, and had resorted to termination only when Flaherty declined its offer. Because we agree that Flaherty has not established a prima facie case under the ADEA, we affirm the district court's judgment. We also affirm the imposition of Fed.R.Civ.P. 11 sanctions on Flaherty's counsel for pursuing a common law retaliatory discharge claim without exhausting the administrative remedies afforded under Illinois law.

## I. BACKGROUND

Our factual discussion is taken largely from the statements submitted by the parties pursuant to Local Rules 12(m) and 12(n) of the United States District Court for the Northern District of Illinois. But this case, like so many others of recent vintage (*see Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921–22 (7th Cir.1994) (compiling cases)), presents several problems under those rules. GRI submitted a lengthy Rule 12(m) statement along with its motion that fully complied with the local rule. The factual averments in GRI's statement were supported by citations to deposition transcripts, which were attached, and to affidavits of company employees. Yet in response, Flaherty submitted no affidavits, nor did he attach supplemental deposition transcripts, although his Rule 12(n) statement referenced pages that had not been provided by GRI. Thus, as the district court noted, "except in those cases where [Flaherty] fortuitously cites to deposition testimony and affidavits tendered by GRI, we are unable to verify the evidence [he] occasionally references." (R. 57 at 2 n. 1.) Equally problematic, Flaherty often asserted in response to GRI's Rule 12(m) statement that a particular fact was disputed without referencing the evidence that would show the nature of that dispute. That is insufficient, as the local rule requires the non-movant to support its disagreement by making "specific references to the affidavits, parts of the record, and other supporting materials" that allegedly establish a factual dispute. Local General Rule 12(n), Northern District of Illinois. We have repeatedly upheld this requirement, indicating that in the absence of such evidence, "district

courts are not obliged in our adversary system to scour the record looking for factual disputes." *Waldridge*, 24 F.3d at 922; *see also Valenti v. Qualex, Inc.*, 970 F.2d 363, 369 (7th Cir.1992). They instead may deem the fact admitted. *Waldridge*, 24 F.3d at 922–23. That having been said, we proceed to describe the factual background of this dispute.

GRI is a not-for-profit corporation engaged in research and development for the benefit of its natural gas industry members. It hired Flaherty as a senior scientist on May 27, 1983, when Flaherty was forty-two years of age. GRI promoted Flaherty in 1985 and again in 1987, and he ultimately became the director of its Industrial Utilization Research Group, where he had primary responsibility for the group's management and strategy planning. In April 1989, however, after an investigation into allegations that Flaherty had made racially derogatory remarks to subordinates, GRI removed Flaherty from his director's position and made him a principal scientist in charge of special projects. By this demotion, GRI sought to relieve Flaherty of his supervisory responsibilities while continuing to utilize his technical expertise. As a principal scientist, Flaherty reported to William Burnett, a GRI senior vice president.

In February 1990, Flaherty became the principal scientist in charge of program quality. Although he still reported to Burnett, Flaherty now worked daily with Irvine Solomon, who was in charge of GRI's quality program. Flaherty managed two contracts for GRI in his capacity as principal scientist for program quality. Their value was between $300,000 (GRI's estimate) and $1.25 million (Flaherty's estimate).

In November 1991, GRI's Board of Directors and its management decided to reduce expenses through a reduction in the company's work force. GRI's president, Stephen Ban, directed all vice presidents to develop staff-reduction plans within their areas of responsibility. Burnett therefore met with the vice presidents in the research and development area and determined to eliminate four existing positions from his staff by

July 1992. Burnett and the vice presidents decided that Flaherty's program quality position would be eliminated and that he would be offered a transfer to another department. Flaherty was informed of this decision in January 1992, and he also was alerted that other departments were in need of personnel. In March or April of that year, Flaherty spoke with William Staats about a position in the Physical Sciences Research Department, and Staats offered Flaherty a part-time position. Flaherty initially indicated that he was unwilling to report to an employee with less experience and expertise, but he ultimately accepted the part-time position and agreed to report directly to Staats.

In May 1992, GRI initiated discussions with employees who were then eligible or who would soon become eligible to collect a pension and retiree medical benefits. GRI was seeking to determine whether any of these employees intended to retire in the next year. GRI explains that these discussions were part of its staff planning program, that it told each employee the company merely was attempting to anticipate staffing needs, and that it did not ask anyone to retire. GRI also did not offer retirement incentives in the course of these meetings. None of the employees approached by GRI expressed an intention to retire in 1992.

When he learned of these discussions, Flaherty asked Jan Pastryk, a director and attorney for GRI, whether the company may be engaging in some form of age discrimination. Flaherty also mentioned to Pastryk that Burnett had indicated at a recent meeting that GRI's president wanted a "younger GRI." Pastryk did not respond to Flaherty, but she passed his comments along to Thomas LaForce, GRI's Director of Human Resources.

On May 15, 1992, Flaherty received two memos from Burnett. The first reprimanded Flaherty for three comments that had angered company management. (*See* R. 48, Ex. B.) This memo recited that Flaherty had made "several disparaging remarks"

about a former GRI employee at a managers' meeting in April 1992 and that "[s]everal of the attendees spoke up quickly to interrupt you." (*Id.*) Next, the memo alleged that at a May 1992 meeting of natural gas industry advisors, Flaherty told the assemblage: "I'm a principal scientist at GRI. If any of you can tell me what that means, I'd like to know." The memo explained:

> I cannot imagine what would motivate you, or anyone, to stand up in front of a group of important advisors and say, in effect, that they do not know what their job is, and whatever it is, it certainly isn't important. This public statement requires that I take action regarding your job assignment.

(*Id.*) Finally, the memo also referenced Flaherty's comments to Pastryk:

> Regarding an ongoing planning effort at GRI to determine the future plans of our employees eligible for retirement, you were reputed to have told a GRI staff member that Steve Ban and Bill Burnett want a younger organization so we have plans to offer an early retirement program. This is an outrageous and untrue statement. You certainly didn't ever hear Steve or me say this. Once again, your personal interpretation of GRI policy is way off base.

(*Id.*) Burnett explained that the three incidents "directly parallel the very kinds of poor judgment in your public statements that led to your earlier demotion from a director position." (*Id.*)[1]

Burnett's second May 15 memo formally notified Flaherty that his position would be eliminated pursuant to the company's reduction in force. (*See* Burnett Aff. Ex. E.) Burnett explained that the company's "decisions to decentralize the quality function into each department, as well as your own public comments regarding the lack of function in this position, contributed to our choice to include this position in our staff reduction actions." (*Id.*)[2] Burnett also noted that

---

1. Flaherty responded to this reprimand in a June 15, 1992 memo to Burnett in which he explained his version of the three incidents.

2. Although GRI had informed Flaherty some four months earlier of its intention to eliminate his position, the company had taken little action to implement that decision. LaForce acknowl-

Flaherty would not be considered for a management position at GRI "until a sustained period of good judgment is displayed in your remarks and actions." (*Id.*) But Burnett indicated that he intended to provide Flaherty's name to several GRI department directors who may have program management positions available. The memo stated that Flaherty's termination would become effective on July 15 if he had not secured a position and that Flaherty would be eligible for a full severance upon termination.

Burnett then asked Douglas Thomas in human resources to speak with three department directors about the possibility of hiring Flaherty. Thomas told Flaherty that he would be initiating these contacts. Flaherty subsequently was interviewed by Keith Davidson and Michael Whelan for the position of project manager of GRI's fuel cell program.[3] Thomas eventually offered Flaherty that position and informed him that it was regarded as a lateral transfer with no change in salary or benefits.[4] Flaherty told Thomas he was not interested in the position because he believed his GRI career had come to an end. Flaherty responded in this way, he explains, because Solomon, with whom he worked in program quality, had told Flaherty that he would be unable to stay at GRI in any event and that he would be the first to go. Solomon denies making such a statement.

On June 16, 1992, in what Flaherty calls a "termination meeting" with LaForce,[5] the two discussed the fuel cell position and Flaherty's reasons for declining the company's offer. LaForce also sent Flaherty a memo on that date confirming that the program

---

edged that the three incidents described in Burnett's first memo prompted GRI to implement its earlier decision to decentralize the program quality function and to set a time frame for Flaherty's transfer to another post. When Flaherty's program quality position was eliminated, his responsibilities were assumed in each department by an existing employee who was designated as the department's quality coordinator.

3. A fuel cell is a power generation device that directly converts hydrogen and oxygen via an electrochemical reaction to produce electricity, heat, and water. As project manager of GRI's fuel cell program, Flaherty would have been responsible, *inter alia*, for planning future fuel cell program activities, coordinating GRI's research efforts with the United States Department of Energy, the Electric Power Research Institute, and various gas and electric utilities, and he would have participated in a national fuel cell committee. Flaherty would also have had responsibility for managing six GRI contracts worth more than $6 million. GRI maintains that the fuel cell position would have offered Flaherty increased responsibilities and greater promotional opportunities than his program quality position. Yet the position would have required that Flaherty report to Whelan, who formerly worked under Flaherty.

4. Flaherty's Local Rule 12(n) statement disputes this fact, contending that Thomas only discussed the position with him and that no offers were made. Yet Flaherty conceded in his deposition that Thomas had offered him the position. (Flaherty Dep. at 285, 287.) Moreover, Burnett indicates in his affidavit that he independently offered Flaherty the fuel cell position. Flaherty's Rule 12(n) statement disputes Burnett's assertion but offers no contrary evidence. For instance, Flaherty did not submit an affidavit addressing whether Burnett, or even Thomas, had offered him the fuel cell position. The district court was therefore entitled to disregard Flaherty's denials and to accept GRI's factual assertions as true. *Waldridge*, 24 F.3d at 923; *Bell, Boyd & Lloyd v. Tapy*, 896 F.2d 1101, 1103 (7th Cir.1990) (statement with no reference to supporting materials has no standing under Rule 12(n)). We may therefore assume that Flaherty was offered the fuel cell position by both Thomas and Burnett.

Flaherty also maintains in his Rule 12(n) statement and in his briefs on appeal that Burnett had told him the fuel cell position was a two-level demotion, and that the project was "on the bubble," meaning that its funding could be cut at any time. (R. 49 at 7, 8.) Flaherty also emphasizes that the fuel cell position had been open for over one year before it was offered to him (*id.* at 8), which he interprets as a sign that the position was less than desirable. To support each assertion, Flaherty cites to the transcript of Burnett's deposition, yet he never provided the district court with any portion of the Burnett transcript, meaning that the court could not verify whether Burnett's testimony supports Flaherty's assertions. The district court noted this shortcoming in its opinion granting summary judgment, yet Flaherty never attempted to have the transcripts considered through a motion for reconsideration before the district court or by attempting to supplement the record before this court. Because they are not before us, Flaherty cannot rely on the cited pages of the Burnett transcript to create a factual issue here (*see* Circuit Rule 28(d)(2)), although it is unlikely that the statements attributed to Burnett would change our decision today.

5. Burnett and the company's Director of Legal Services also were present at this meeting.

quality position had been eliminated and that Flaherty's employment would be terminated. (*See* LaForce Aff. Ex. C.) The memo reiterated that Flaherty had declined the company's offer of a position in the fuel cell program at his existing level and salary. LaForce also indicated that Flaherty was ineligible for severance benefits because he had declined the transfer offer. (*Id.*)

Even before his termination became final, Flaherty filed complaints with the Illinois Department of Human Rights and the Equal Employment Opportunity Commission. He then filed this action in district court, alleging age discrimination and retaliation claims under the ADEA, as well as a retaliatory discharge claim under Illinois law.[6] The district court dismissed the common law claim because Flaherty had failed to exhaust his administrative remedies under the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/1-101 *et seq.* The court also sanctioned Flaherty's counsel under Fed.R.Civ.P. 11 because he had persisted in reasserting the common law claim after having been apprised of controlling Illinois authority that would require its dismissal. The district court subsequently granted GRI's motion for summary judgment on the ADEA claims, finding that Flaherty had not suffered an adverse employment action under that statute.

## II. DISCUSSION

### A.

We review the district court's grant of summary judgment de novo, construing the evidence in the light most favorable to Flaherty and according him the benefit of all reasonable inferences. *Monaco v. Fuddruckers, Inc.,* 1 F.3d 658, 660 (7th Cir.1993). In an employment discrimination case, we will affirm summary judgment " 'only if, had the record before th[e] [district] court been the record of a complete trial, the defendant would have been entitled to a directed verdict.' " *Robinson v. PPG Indus., Inc.,* 23 F.3d 1159, 1162 (7th Cir.1994) (quoting *Sar-*

*sha v. Sears, Roebuck & Co.,* 3 F.3d 1035, 1038 (7th Cir.1993)).

 To establish a prima facie case under the ADEA, Flaherty must show, *inter alia,* that he suffered a materially adverse employment action. *Monaco,* 1 F.3d at 660; *Crady v. Liberty Nat'l Bank and Trust Co.,* 993 F.2d 132, 134–36 (7th Cir.1993); *Spring v. Sheboygan Area School Dist.,* 865 F.2d 883, 885 (7th Cir.1989). Because the overwhelming majority of ADEA claimants have been discharged rather than transferred, this element of the prima facie case is often not disputed. But employment actions that fall short of outright termination may also be actionable under the ADEA. Indeed, *Crady* explains that an actionable change in employment status might be indicated by the following less drastic measures: "a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." 993 F.2d at 136; *see also Monaco,* 1 F.3d at 662 n. 7. At the same time, our cases indicate that an ADEA plaintiff does not establish a prima facie case by showing only that a job transfer would cause personal inconvenience or altered job responsibilities. *Crady,* 993 F.2d at 136. As we explained in *Spring,* the ADEA prohibits age discrimination, "not changes in duties or working conditions that cause no materially significant disadvantage to an older employee." 865 F.2d at 885. We have therefore found no adverse employment action when the branch manager of a bank became a collections officer at another branch while retaining the same salary and benefits. *Crady,* 993 F.2d at 135–36. Nor did the principal of an elementary school suffer an adverse employment action when transferred to a dual principalship over two elementary schools under a new contract with higher pay. *Spring,* 865 F.2d at 885–86.

 We wish to emphasize, however, that an employer does not insulate itself from

6. Flaherty's original complaint was not brought under the ADEA, but under 42 U.S.C. § 1983. Flaherty alleged that GRI had violated his rights under the Fourth, Fifth, and Fourteenth Amendments. (R. 1.) After GRI's counsel advised

Flaherty's counsel by letter that no claim could be stated under section 1983 because GRI was not a state actor, Flaherty amended his complaint to bring the present claims under the ADEA. (R. 10.)

liability for discrimination simply by offering a transfer at the same salary and benefits. Indeed, we observed in *Collins v. State of Illinois,* 830 F.2d 692, 703 (7th Cir.1987), that other courts have found adverse employment actions in the following circumstances where salary and benefit levels were retained: "in a employer's moving an employee's office to an undesirable location, transferring an employee to an isolated corner of the workplace, and requiring an employee to relocate her personal files while forbidding her to use the firm's stationary and support services." (Citing cases). *Collins* itself found an adverse employment action under Title VII where a library employee had been transferred to a new department but her supervisors were unsure of her new responsibilities, she was largely relegated to reference rather than consulting work, and she had lost her office and telephone. *Id.* at 704; *see also McCabe v. Sharrett,* 12 F.3d 1558, 1564 (11th Cir.1994) (employee suffered adverse job action where she had fewer responsibilities, was made to perform more menial tasks, and had lesser opportunity for salary increases in her new position).

■ That having been said, we believe our decisions in *Crady* and *Spring* present insurmountable obstacles to Flaherty's attempt to show a materially adverse employment action here. The undisputed facts show that Thomas (as well as Burnett) offered Flaherty the fuel cell project manager position. Thomas and Burnett each informed Flaherty that the company considered this a lateral transfer that would not change his salary or benefits. Moreover, Flaherty's responsibilities would have been comparable to those assigned him as a principal scientist, and would have included primary responsibility for six GRI contracts worth approximately $6 million. The company also maintains, and Flaherty has not refuted, that the fuel cell position presented Flaherty with greater growth potential than his program quality position, which GRI was eliminating.

Flaherty does not dispute these facts but points out that the fuel cell position would

have required that he report to a former subordinate who was merely a manager, whereas he previously had reported to a senior vice president. In addition, he maintains that his own title would have changed from principal scientist to senior project manager. Yet those changes are largely semantic where the employee's salary, benefits, and level of responsibility would remain unchanged. Although the reporting relationship may have bruised Flaherty's ego, we indicated in *Spring* that a plaintiff's perception that a lateral transfer would be personally humiliating is insufficient, absent other evidence, to establish a materially adverse employment action. 865 F.2d at 885–86. Moreover, *Crady* holds that the loss of an existing title also would not satisfy this element of the prima facie case. Because a change in title would often go hand in hand with a new reporting relationship, the two together have little or no cumulative effect.[7]

Unable to establish that the fuel cell position was materially adverse, Flaherty contends that GRI's offer was not genuine because Thomas had no authority to extend it. But again, Flaherty points to no evidence to support his bald assertion. The evidence instead shows that Thomas had absolute authority to make such offers and that he routinely did so in his position with human resources. Although Flaherty may have honestly believed that Thomas lacked the authority to make a genuine offer, he never expressed that concern to Thomas or to anyone else at GRI who may have been in a position to confirm Thomas' authority. Moreover, because Flaherty came forward with no contrary evidence, we may assume that Burnett also offered Flaherty the fuel cell position. No issue remains, then, as to the genuineness of GRI's offer of continued employment.

Flaherty finally reminds us of Solomon's alleged statement that he would be unable to stay at GRI in any event and that he would be the first to go. Flaherty maintains that Solomon's remark signaled that his GRI career was at an end and that it would be

7. In any event, Burnett insists that he assured Flaherty he would retain the title of principal scientist even if he accepted the fuel cell position.

(R. 44 ¶ 81.) Flaherty disputes Burnett's assertion but again offers no contradictory evidence. (R. 49 ¶ 81.)

fruitless to accept a further offer. We must assume on summary judgment that Solomon made the remark attributed to him, but that does not alter our conclusion, as Flaherty has not shown that Solomon was in any way involved in the decisions to eliminate the program quality position and ultimately to terminate Flaherty's employment. Indeed, Flaherty's counsel conceded at oral argument that Burnett and not Solomon made the relevant decisions. Thus, even if Flaherty's hearsay assertions would be admissible at trial, which is unlikely, they would not justify Flaherty's refusal of a lateral transfer that he has not shown to be adverse. We therefore affirm the district court's judgment on Flaherty's ADEA claims.

## B.

Flaherty also challenges the Fed. R.Civ.P. 11 sanctions imposed on his counsel for reasserting a common law retaliatory discharge claim after GRI had apprised him of controlling Illinois authority that would require dismissal of such a claim. We first note that counsel was not named as an appellant in Flaherty's notice of appeal. (R. 61.) Although GRI has not raised the issue, our cases hold that a party may not appeal a sanction imposed only on his counsel but that counsel must instead appeal in his own name. *See Harrison v. Dean Witter Reynolds, Inc.,* 974 F.2d 873, 885–86 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2994, 125 L.Ed.2d 688 (1993); *Rogers v. National Union Fire Ins. Co.,* 864 F.2d 557, 559–60 (7th Cir.1988). Under those cases, we would therefore lack jurisdiction over Flaherty's appeal of the sanctions order.

But *Harrison* and *Rogers* were based on *Torres v. Oakland Scavenger Co.,* 487 U.S. 312, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988), where the Supreme Court strictly applied Fed.R.App.P. 3(c)'s requirement that a notice of appeal "specify the party or parties taking the appeal." Rule 3(c) was amended effective December 1, 1993, however, to provide that an appeal should not be dismissed "for

failure to name a party whose intent to appeal is otherwise clear from the notice." The amendment effectively overrules *Torres* (*see Garcia v. Wash,* 20 F.3d 608, 609 (5th Cir. 1994)), and it may therefore also impact our decisions in *Harrison* and *Rogers,* although its effect in that regard is not entirely clear. We hesitate to resolve the issue today, however, as the parties have not raised it, and we are therefore without the benefit of any briefing or argument addressing it. We need not resolve the question in any event, for as we explain below, even if the jurisdictional hurdle is surmounted, the sanction would stand.

We review the imposition of sanctions under Rule 11 for an abuse of discretion. *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 405, 110 S.Ct. 2447, 2460–61, 110 L.Ed.2d 359 (1990); *Milwaukee Concrete Studios, Ltd. v. Fjeld Mfg. Co.,* 8 F.3d 441, 448 (7th Cir. 1993).[8] The district court dismissed Flaherty's common law claim and then sanctioned his counsel on the strength of *Mein v. Masonite Corp.,* 109 Ill.2d 1, 92 Ill.Dec. 501, 485 N.E.2d 312 (1985). There, the Illinois Supreme Court considered an age-discrimination complaint filed in state court when the plaintiff had a similar complaint pending before the Illinois Human Rights Commission under the IHRA. Referencing the Act's comprehensive investigative and adjudicative procedures, the court concluded that the state legislature had intended the Act "to be the exclusive source for redress of alleged human rights violations." *Id.* 92 Ill.Dec. at 504, 485 N.E.2d at 315. Indeed, the Act states that "courts have no jurisdiction to hear independent actions for civil rights violations." *Id.* (citing Ill.Rev.Stat. ch. 68, ¶ 8–111(D), recodified at 775 ILCS 5/8–111(C)). Judicial review is instead available under the IHRA only after the Human Rights Commission has issued a final order on a complaint. 775 ILCS 5/8–111(A)(1); *see Mein,* 92 Ill. Dec. at 503–04, 485 N.E.2d at 314–15 (outlining IHRA procedures); *see also Welch v. Johnson,* 907 F.2d 714, 725 n. 12 (7th Cir. 1990) (in light of IHRA, courts have no jurisdiction to hear independent actions for hu-

8. Although Rule 11 was amended as of December 1, 1993, we apply the pre-amendment version here, as Judge Aspen imposed the sanction in April 1993. *See Land v. Chicago Truck Driv-* *ers, Helpers and Warehouse Workers Union (Independent) Health and Welfare Fund,* 25 F.3d 509, 515–17 (7th Cir.1994).

man rights violations); *Brown v. Reliable Sheet Metal Works, Inc.,* 852 F.2d 932, 935 (7th Cir.1988).

Although Flaherty filed a claim under the IHRA, he abandoned that claim once he commenced this action in federal court. Yet because the Human Rights Commission never issued a final order on his claim, Flaherty could not pursue an independent common law action in federal court. *Mein* instead indicates that the district court was required to dismiss the claim for failure to exhaust administrative remedies under the Act. *See, e.g., Cahoon v. Alton Packaging Corp.,* 148 Ill.App.3d 480, 101 Ill.Dec. 934, 935, 499 N.E.2d 522, 523 (1986). The district court thus sanctioned Flaherty's counsel, concluding that a reasonable inquiry into Illinois law would have revealed that the common law claim could not stand. Indeed, the court noted that GRI had apprised Flaherty's counsel of the *Mein* decision before he filed Flaherty's amended complaint.

Flaherty finds *Mein* to be distinguishable, however, because that case involved an age discrimination claim, whereas he has alleged a retaliatory discharge. We agree with the district court that this is a superficial distinction. Retaliation resulting from opposition to age-based discrimination also is encompassed by the IHRA (*see* 775 ILCS 5/6–101(A)), and such a claim is therefore clearly within the scope of *Mein. See, e.g., Petrik v. Monarch Printing Corp.,* 143 Ill.App.3d 1, 97 Ill.Dec. 809, 812, 493 N.E.2d 616, 619 (1986). The district court did not abuse its discretion in finding that counsel violated Rule 11 when he reasserted the retaliatory discharge claim after having been apprised by opposing counsel of *Mein* and its progeny.

## C.

Finally, GRI asks that we impose an additional sanction under Fed.R.App.P. 38 for the pursuit of a frivolous appeal. Sanctions are justified under Rule 38 " 'when the result is obvious or when the appellant's argument is wholly without merit.' " *Ross v. City of Waukegan,* 5 F.3d 1084, 1090 (7th Cir.1993) (quoting *Spraying Sys. Co. v. Delavan, Inc.,* 975 F.2d 387, 396 (7th Cir.1992)). We also have required some evidence that an appeal was pursued in bad faith before finding that sanctions should be imposed. *Ross,* 5 F.3d at 1090; *Koffski v. Village of North Barrington,* 988 F.2d 41, 45 n. 8 (7th Cir. 1993); *Rodgers v. Wood,* 910 F.2d 444, 449 (7th Cir.1990). Although the ADEA issues here were not particularly close and the appeal of Rule 11 sanctions bordered on the frivolous, there is no indication that Flaherty pursued this appeal in bad faith. In any event, we may refuse to impose sanctions under Rule 38 even where a sanction may have been justified. *City of East St. Louis v. Circuit Court for the Twentieth Judicial Circuit,* 986 F.2d 1142, 1145 (7th Cir.1993). We believe that an additional sanction here would serve no useful purpose, and we accordingly decline to impose one.

The district court's judgment is in all respects

AFFIRMED.