**Kiros Tewolde' GABRIEL, Plaintiff,**

v.

**CITY OF CHICAGO, Defendant.**

**No. 96 C 7123.**

United States District Court,
N.D. Illinois,
Eastern Division.

July 7, 1998.

Jimmie L. Jones, J.L. Jones & Associates, Ltd., Chicago, IL, for Plaintiff.

Mary Leone Smith, Catharine Mullen Hennessy, Susan S. Sher, City of Chicago, Law Dept., Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

CASTILLO District Judge.

Plaintiff Kiros Tewolde' Gabriel brought this action against her former employer, the City of Chicago, seeking damages arising from the City's termination of her employment. Gabriel raised three claims in her original complaint. Count I alleged that the City fired Gabriel, who is African–American, because of her race in violation of Title VII. In Count II, Gabriel charged the City with terminating her employment in violation of 42 U.S.C. § 1983. Count III alleged that the City refused to make reasonable accommodations for complications arising from Gabriel's pregnancy and subsequently discharged her in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*

The City filed a motion to dismiss all three counts. On March 18, 1997, this Court granted the motion in part, dismissing Count I with prejudice and Count II without prejudice. Currently before the Court is the City's motion for summary judgment on Count III.[1] The City's sole ground for the motion is that Gabriel has failed as a matter of law to establish that she suffers from a disability. In assessing this issue, the City argues, we must deem the facts in its Local General Rule 12(M) fact statement admitted because Gabriel's Rule 12(N) response and statement of additional facts are not supported by citations to the record. We disagree with both points,[2] and deny the City's

---

1. Gabriel has not amended her complaint in attempt to revive Counts I or II, which leaves Count III as the only remaining claim.

2. The Northern District of Illinois' Local General Rule 12(N)(3)(a) requires the non-moving party to file a concise response to the movant's Rule 12(M) statement of facts, including, in the case of any disagreement, specific references to supporting materials. Rule 12(N)(3)(b) authorizes the non-moving party to submit a statement of "additional facts that require the denial of summary judgment" as well—which must also be supported by citations to the record. All properly supported material facts set forth in either the movant's 12(M) statement or the non-movant's 12(N)(3)(b) statement are deemed admitted unless properly controverted. *See* Local Rule 12(M) and 12(N)(3)(b); *see also Flaherty v. Gas Research Institute*, 31 F.3d 451, 453 (7th Cir. 1994). The non-movant's mere denial of a particular fact without specific references to the affidavits, parts of the record, and other support-

ing materials is insufficient, and, where a properly supported factual assertion is met with such a naked denial, the fact may be deemed admitted. *Id.*

It is true that all the statements in Gabriel's original 12(N) filing and some statements in her amended 12(N) submission fail to comply with these requirements because they do not cite to the record for support. Nevertheless, Gabriel attaches documents and excerpts from her deposition that support many of the statements in her 12(N) submissions, and most statements in the amended 12(N) do refer to the record. In addition, "it is within the court's discretion to overlook transgressions of Local Rule 12(M)." *Brandy v. Long John Silver's*, 1997 WL 790726, at *1 (N.D.Ill.Dec.22, 1997) (citing *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 1994)); *see also Caruthers v. Matos*, 1997 WL 208445, at *1 (N.D.Ill. Apr.21, 1997) ("Whether Local Rules 12(M) and (N) are 'strictly or leniently' enforced is left to the court's discretion.").

motion for summary judgment.

## RELEVANT FACTS

As is required in summary judgment proceedings, we begin by presenting the facts in a light most favorable to the plaintiff.[3] Gabriel was hired by the City of Chicago Police Department on June 5, 1995 as a probationary data entry operator. Def.'s Facts ¶ 3. Gabriel's probationary period was six months, and would have ended on December 5, 1995. Def.'s Facts ¶ 4.

In July 1995, Gabriel notified her supervisor, Katie Jezidija, that she was pregnant. Def.'s Facts ¶ 8. Later that month, Gabriel informed Jezidija that she was having a difficult pregnancy. Gabriel Dep. at 31. Gabriel explained that she was suffering from back pain and experiencing sharp pains in her stomach. *Id.* She told Jezidija that the pain prevented her from standing for long periods of time, that she had swollen feet, and felt fatigued. *Id.* Jezidija replied that Gabriel needed a note from her doctor verifying her condition. Pl.'s Facts ¶ 25. Gabriel complied by submitting a "Disability Certificate" dated July 25, 1995 from Dr. Albert Chams, which explained that Gabriel could perform only light work duties for the duration of her pregnancy. Pl.'s Am. Facts ¶ 12(b). Jezidija accommodated Gabriel's request that she no longer lift boxes, pull cabinets or carry heavy folders. Pl.'s Am. Facts ¶ 12(a).

Sometime in October 1995, Jezidija was replaced by Kathy Meehan. Pl.'s Am. Facts ¶ 12(c); Pl.'s Facts Ex. D. Gabriel testified that Meehan exhibited a rigid, unaccommodating attitude toward Gabriel's physical limitations. Pl.'s Am. Facts ¶ 12(d); Gabriel Dep. at 79. For example, Gabriel complained in November 1995 that she was having problems standing; Meehan responded that Dr. Chams' Disability Certificate was "vague," and that he had to "fill out [a] form" indicating Gabriel's specific limitations.[4] Pl.'s Am. Facts App. C. Meehan's handwritten notes dated November 8, 1995 document

that Meehan met with Gabriel and made clear that

> [T]here is no limited duty for civilians. Could have dr. fill out form but needed to understand. Went over definition for limited duty vs. full duty. Told her to think of officers for full duty and must be able to perform all functions of job. She asked re: disability and limited duty and I mentioned she was on probation.

Pl.'s Am. Facts Ex. C. Meehan insisted that Gabriel "must perform all duties required at the front desk," noting that Gabriel "had not been performing some duties in deference to the doctor's note." Pl.'s Am. Fact. Ex. D. Meehan proceeded to force Gabriel to perform tasks that involved heavy lifting, pulling and carrying. Pl.'s Am. Facts ¶ 12(d)(2)-(3).

It is undisputed that Gabriel did not receive any negative performance evaluations until November 1995, after Meehan began to supervise her. Meehan reviewed Gabriel on November 8, 1995, remarking that although Gabriel is "cooperative," "[m]eets public well," and "is learning computer well," she "must be better about time," "must learn to handle the front desk alone," and "must pick up on [computer] speed." Pl.'s Am. Facts App. C. Meehan stated in the review that Gabriel "must perform all work at front desk," and that she would "accommodate" Gabriel "by having the file clerks pull files for her when possible." *Id.*

Following this review, Gabriel claims that Meehan and another supervisor, Lance Lewis, began to magnify minor errors. Pl.'s Am. Facts ¶ 12(e). Lewis noted on a November 16, 1995 Counseling Session Report that Gabriel did not complete an assignment to enter medical absence slips on the computer. Pl.'s Am. Facts ¶ 12(e)(1). However, a contemporaneous memo from the medical records supervisor says that "THIS IS OK! *NOT A COMPLAINT* !" *Id.* On November 20, 1995, Meehan noted on a Counseling Session Re-

---

We exercise our discretion not to enforce Rule 12(N) strictly here because to do so would unfairly punish Gabriel for her attorney's poor performance.

**3.** The following facts are derived from the parties' Rule 12(M)-(N) submissions and accompanying exhibits.

**4.** Meehan did not receive a completed form or a more detailed description of Gabriel's restrictions.

port that Gabriel had not completed a copying assignment on November 18th. Pl.'s Am. Facts ¶ 12(e)(2). Gabriel responded in the space for her comments that she had completed 4–3/4 of the five files given to her, and that work had been interrupted by referrals, phone work and a malfunctioning copier. *Id.* At some point in November 1995, Gabriel informed Meehan that she would be taking a leave of absence in December 1995 because she was experiencing pregnancy-related difficulties. Pl.'s Facts ¶ 35.

When the time came in late November to determine whether to promote Gabriel to permanent status, Meehan recommended against it. She explained that Gabriel was not always ready to begin work at her scheduled starting time, that she could not work quickly enough to keep up with the fast-paced workload, and that she had taken five days off between June and mid-November 1995, all of which bordered a weekend or a scheduled day off. On November 21, 1995, Meehan wrote a memo to Commander Thomas P. Sadler of the Personnel Division requesting authorization to terminate Gabriel's employment on these grounds. *See* Def.'s Facts Ex. 6.

The City authorized Gabriel's termination on November 27, 1995. Def.'s Facts Ex. 7. Meehan and Lewis met with Gabriel two days later to tell her about the decision. Pl.'s Am. Facts Ex. 1. Meehan explained that while the quality of Gabriel's work was good in that she was a "well-met and cooperative employee," the quantity of her work was only minimally acceptable and her work attendance was unacceptable. Meehan characterized Gabriel's absence from work five days over the course of six months as a "pattern of taking time off around weekends over her regular day off." *Id.* As a result, Meehan explained that the City was "not going to pass her on probation." *Id.* Gabriel challenged Meehan's evaluation, stating that she performed the same duties and completed the same amount of work as the other front desk employees. With regard to her attendance, Gabriel explained that her condition required taking some time off for doctor's appointments, that she had never taken time off without pay, and that she actually had one vacation day left. *Id.* Gabriel was emphatic that she had not been treated fairly. *Id.*

Five days after she was fired, Gabriel went into premature labor and gave birth—two months before her due date. Pl.'s Facts ¶ 42. Gabriel experienced back pain for six weeks following the birth of her baby. Gabriel Dep. at 78. Since that time, Gabriel has not suffered from any of the ailments that she had during her pregnancy. Def.'s Facts ¶ 15.

Gabriel filed a timely charge of disability discrimination with the Equal Employment Opportunity Commission ("EEOC") on March 4, 1996, and that agency issued her a Notification of Right to Sue on July 30, 1996. Gabriel then filed this action under the ADA. She claims that the City engaged in disability discrimination by (1) refusing to accommodate the physical limitations stemming from her pregnancy-related impairments; and (2) firing her based on her pregnancy-related impairments, absences for obstetric appointments, and her planned pregnancy-related leave of absence. The City moves for summary judgment, arguing that neither Gabriel's pregnancy nor its related ailments constitute disabilities under the ADA.

## LEGAL STANDARDS

Summary judgment is proper when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.,* 40 F.3d 146, 150 (7th Cir.1994). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must view all the evidence in a light most favorable to the nonmoving party, and draw all reasonable inferences from the evidence in the nonmovant's favor. *Cincinnati Ins.,* 40 F.3d at 150; *Wolf v. Buss America, Inc.,* 77 F.3d 914, 918 (7th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 175, 136 L.Ed.2d 116 (1996). But if the evidence is merely colorable, or is not significantly probative, or just raises "some metaphysical doubt as to the material facts," summary judgment may be granted. *Liberty Lobby,* 477 U.S. at 261, 106 S.Ct.

2505; *Unterreiner v. Volkswagen of America, Inc.,* 8 F.3d 1206, 1212 (7th Cir.1993).

The court's sole function is to decide whether sufficient evidence exists to support a verdict in the nonmovant's favor. Credibility determinations, weighing evidence, and drawing reasonable inferences are jury functions, not those of a judge deciding a motion for summary judgment. *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. 2505. This standard is applied with added rigor in employment discrimination cases, where issues of intent and credibility often dominate. *Sarsha v. Sears, Roebuck & Co.,* 3 F.3d 1035, 1038 (7th Cir. 1993).

## ANALYSIS

### I. What Is a Disability?

In order to state a claim under the ADA, a plaintiff must have a disability, which is defined as "a physical or mental impairment that substantially limits one or more of the major life activities" of an individual. 42 U.S.C. § 12102(2)(A). The Supreme Court recently applied this statutory language to reach the conclusion that a woman's HIV infection constituted a disability. *Bragdon v. Abbott,* —— U.S. ——, 118 S.Ct. 2196, 2201, 141 L.Ed.2d 540 (1998). The Court set forth the proper analysis for determining whether the statutory definition of disability has been met:

> First, we consider whether respondent's HIV infection was a physical impairment. Second, we identify the life activity upon which respondent relies (reproduction and child bearing) and determine whether it constitutes a major life activity under the ADA. Third, tying the two statutory phrases together, we ask whether the impairment substantially limited the major life activity.

*Id.* at 2201; *see also DePaoli v. Abbott Labs.,* 140 F.3d 668, 671 (7th Cir.1998); *Pacourek v. Inland Steel Co.,* 916 F.Supp. 797, 801 (N.D.Ill.1996); *Patterson v. Xerox Corp.,* 901 F.Supp. 274, 277 (N.D.Ill.1995).

The EEOC has issued regulations under the ADA, defining "physical or mental impairment" as "a physiological disorder or condition" that affects one or more body systems, including the reproductive system. 29 C.F.R. § 1630.2(h)(1). "Major life activi-

ties" include, but are not limited to, "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(i). The EEOC's Interpretive Guidance appended to the regulations adds more detail, explaining that sitting, standing, lifting, and reaching are also major life activities. 29 C.F.R. app. pt. 1630, § 1630.2(i).

An individual is "substantially limited" by an impairment if she is "significantly restricted as to the condition, manner and duration under which [she] can perform a particular major life activity as compared to the condition, manner and duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j). When determining whether a disability "substantially limits" a person from performing a major life activity, courts consider: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact, or the expected long term impact of or resulting from the impairment. *Id.* § 1630.2(j)(2). Thus, courts have generally found that "short-term, temporary restrictions are not substantially limiting" and do not render a person disabled for the purposes of the ADA. *Hamm v. Runyon,* 51 F.3d 721, 725 (7th Cir.1995).

The Supreme Court relied on these EEOC regulations, as well as regulations interpreting the Rehabilitation Act (a pre-ADA statute that prohibits disability discrimination in public accommodations), in concluding that a woman infected with HIV suffers from a physical impairment from the moment she is infected, and that this impairment substantially limits the major life activity of reproduction. *Abbott,* 118 S.Ct. 2196 at 2204-05. First, the Court reviewed the medical and scientific evidence, discussing HIV's affects on body's systems from initial infection to development into full-blown AIDS. Because the virus begins an immediate and irreversible attack as soon as it enters the body, the Court held that "HIV infection must be regarded as a physiological disorder with a constant and detrimental effect on the infect-

ed person's hemic and lymphatic systems from the moment of infection." *Id.* at 2204. Second, the Court made clear that reproduction is a major life activity under the ADA. Although neither the ADA nor the Rehabilitation Act regulations include reproduction in the list of major life activities, the Court pointed out that these regulatory lists do not purport to be exhaustive. The touchstone for determining whether an activity falls within the rubric of "major life activity," according to the Court, is its significance. *Id.* Because "[r]eproduction and the sexual dynamics surrounding it are central to the life process itself," and "could not be regarded as any less important than [the listed activities of] working and learning," the Court found that reproduction easily meets the significance standard. *Id.* at 2204–05.

Finally, the Court's detailed evaluation of the medical evidence led it to hold that HIV substantially limits reproduction in two ways: an infected woman risks infecting her partner during the activities leading to conception, as well as the baby during gestation and childbirth. *Id.* at 2206. The Court emphasized that "substantial limitation" is not synonymous with "utter inability"; while HIV does not render conception and childbirth impossible, it puts the infected person at great risk of seriously damaging the public health—not to mention her own economic and legal welfare—if she engages in these activities. *Id.* at 2206. The Court poignantly summed it up: "In the end, the disability definition does not turn on personal choice. When significant limitations result from the impairment, the definition is met even if the difficulties are not insurmountable." *Id.*

While the *Abbott* decision makes clear that reproduction is a major life activity, it does not explain whether or under what circumstances functions of the reproductive system—such as pregnancy—can constitute disabilities. Nor has the Seventh Circuit had occasion to determine whether or when pregnancy and pregnancy-related difficulties can render a woman disabled under the ADA. Our own research has not disclosed any helpful authority from other circuits. The reason for this dearth of authority is likely that claims of this nature are brought pursuant to the Pregnancy Discrimination Act of 1978 ("PDA"), 42 U.S.C. § 2000e(k), which specifically prohibits discrimination on the basis of pregnancy or related medical conditions.

There are, however, district court decisions that address the ADA's application to pregnancy and its associated difficulties. Indeed, this Court visited the issue over three years ago in *Chapsky v. Baxter Mueuller Div.*, 1995 WL 103299 (N.D.Ill. Mar.9, 1995). In *Chapsky*, we relied on *Pacourek v. Inland Steel Co.*, 858 F.Supp. 1393, 1404–05 (N.D.Ill. 1994), to rule that a woman suffering from pregnancy-related complications was disabled under the ADA. The *Pacourek* court had held that a woman who was incapable of becoming pregnant through natural means was disabled. 858 F.Supp. at 1405. Our conclusion was based in part on *Pacourek*'s determination—now confirmed as correct by the Supreme Court's decision in *Abbott*—that reproduction is a major life activity. 1995 WL 103299, at *3; *see* 858 F.Supp. at 1404. The *Pacourek* court reasoned that the plaintiff's infertility was a physical impairment that substantially limited reproduction. 858 F.Supp. at 1405. Along the same lines, we found that the plaintiff's pregnancy-related complications in *Chapsky* were impairments that substantially limited reproduction. 1995 WL 103299, at *3. We also held, more broadly, that pregnancy itself is a recognized disability under the ADA. *Id.*

Unfortunately, our decision in *Chapsky* has been soundly criticized. First, many courts have noted that *Chapsky* unduly extended the *Pacourek* holding in concluding that pregnancy itself is a disability. *See, e.g., Wenzlaff v. NationsBank*, 940 F.Supp. 889, 890–91 (D.Md.1996) (dismissing ADA claim because pregnancy is not a disability under the ADA); *Gudenkauf v. Stauffer Communications, Inc.*, 922 F.Supp. 465, 473 (D.Kan. 1996) (granting summary judgment on ADA claim because pregnancy is not a disability).

Second, our distinguished colleague from Kansas, Judge Crow, observed in *Gudenkauf* that "*Chapsky* neither cited nor discussed the EEOC's interpretive guidance concerning pregnancy as an impairment." 922 F.Supp. at 473. The EEOC's Interpretive Guidance states that in determining whether an individual has a "physical or mental impairment it is important to distinguish be-

tween conditions that are impairments and physical, psychological, environmental, cultural and economic characteristics that are not impairments." 29 C.F.R. pt. 1630 app. § 1630.2(h). It specifically provides that "conditions, such as pregnancy, that are not the result of a physiological disorder are also not 'impairments.'" *Id.* (emphasis added). However, the EEOC Compliance Manual distinguishes pregnancy from its related complications, which may be considered impairments under certain circumstances. *See Darian v. University of Massachusetts Boston,* 980 F.Supp. 77, 85 (1997) (citing 2 EEOC COMPLIANCE MANUAL, EEOC Order 915.002 § 902.2(c)(3) n. 16)).

■ Consistent with the EEOC's Interpretive Guidance, many courts have held that pregnancy, absent abnormal or unusual circumstances, is not a disability. *See Richards v. City of Topeka,* 934 F.Supp. 378, 382 (D.Kan.1996); *Jessie v. Carter Health Care Ctr.,* 926 F.Supp. 613, 616 (E.D.Ky.1996); *Villarreal v. J.E. Merit Constructors, Inc.,* 895 F.Supp. 149, 152 (S.D.Tex.1995); *Tsetseranos v. Tech Prototype, Inc.,* 893 F.Supp. 109, 119 (D.N.H.1995); *Byerly v. Herr Foods, Inc.,* 1993 WL 101196, at *4 (E.D.Pa. April 6, 1993). As such, we believe it is appropriate to modify *Chapsky*'s broad holding that pregnancy is a disability per se.

■ Much of *Chapsky* remains good law, however. The Supreme Court's *Abbott* decision confirms that reproduction is indeed a major life activity. And several district courts, as well as the EEOC, have recognized that pregnancy-induced ailments and complications may constitute physical impairments—impairments that affect not only reproduction, but other major life activities as well, such as working, walking, and sitting. *See, e.g., Hernandez v. City of Hartford,* 959 F.Supp. 125, 130–31 (D.Conn.1997); *Patterson v. Xerox Corp.,* 901 F.Supp. 274, 278 (N.D.Il.1995); *Cerrato v. Durham,* 941 F.Supp. 388, 392–93 (S.D.N.Y.1996); *Darian v. University of Massachusetts Boston,* 980 F.Supp. 77, 85–87 (1997); *Garrett v. Chicago Sch. Reform Bd. of Trustees,* 1996 WL 411319, at *2–3 (N.D.Ill. July 19, 1996). We examine these decisions to formulate a workable standard for determining when pregnancy-related difficulties meet the ADA's definition of a disability.

*Hernandez v. Hartford,* 959 F.Supp. 125, 130–31 (D.Conn.1997), represents the soundest approach. In *Hernandez,* the court held that pregnancy-related conditions that are not the function of a normal pregnancy can be disabilities under the ADA. First, the court addressed the impairment prong, drawing a distinction between "pregnancy and complications caused by pregnancy," the latter of which may constitute impairments if they are the product of a "physiological disorder"—one type of physical impairment listed in the EEOC regulations. *Id.* at 130. The court observed that "physiological disorder" is defined in the medical literature as "an abnormal functioning of the body or a tissue or organ." *Id.* (quoting DORLAND'S MEDICAL DICTIONARY (27th ed.1988)). It also relied on current medical knowledge to distinguish between normal and abnormal functions of pregnancy. *Id.* The American Medical Association's Council on Scientific Affairs ("Council") states that "'most women with uncomplicated pregnancies should be able ... to continue productive work until the onset of labor,'" but lists several "'substantial complications' of pregnancy that 'may be disabling for further work.'" *Id.* (quoting *Council on Scientific Affairs, Effects of Pregnancy on Work Performance,* 251 JAMA 1995, 1997 (1984)), *cited in Cerrato v. Durham,* 941 F.Supp. 388, 393 (S.D.N.Y. 1996). Among these complications are the "premature rupture of membranes, vaginal bleeding, ... risk of premature [birth] ... and a number of others." *Id.* Applying these definitions to the plaintiff's condition—premature labor that was controlled only by medication—the court observed that "[c]learly, plaintiff's condition was not a function of a normal pregnancy. It was a physiological disorder" as a matter of law. *Id.* at 130.

Next, the court determined that this impairment substantially limited the major life activity of working. It acknowledged that "[i]ntermittent, episodic impairments are not considered disabilities," and that it had to consider the severity, duration, and long-term impact of the plaintiff's impairment. *Id.* at 131 (quoting *Vande Zande v. Wisconsin Dep't of Admin.,* 44 F.3d 538, 543 (7th Cir.1995); 29 C.F.R. § 1630.2(j)(2) & app. pt. 1630). Nevertheless, it was sufficient for

purposes of demonstrating a substantial limitation that the risk and symptoms of plaintiff's premature labor persisted throughout her pregnancy and were controlled only through medication. The plaintiff's condition was also severe, as shown by her gynecologist's note explaining the gravity of her problems and asking that the plaintiff be permitted to work at home. *Id.* This condition substantially limited the plaintiff's ability to work because she was unable to perform certain administrative tasks, such as responding to phone calls, when her high blood pressure prevented her from taking medication. She could do this work only at the risk of premature child birth. *Id.* Finding that the plaintiff met all three prerequisites to a disability, the court denied the employer's motion for summary judgment.

■ Several other district courts have taken a similar approach, distinguishing between functions of normal pregnancies on one hand, and abnormal or unusual pregnancy-related conditions on the other. These courts find that the latter may constitute impairments under the ADA if they meet the EEOC's definition of physiological disorders or impairments of the reproductive system. In making this determination, these decisions examine the symptoms resulting from pregnancy, as opposed to focusing on the condition of pregnancy itself. The courts then ask whether the impairments resulting from pregnancy substantially limit a major life activity—and most find this to be a question of fact not appropriate for determination on dispositive motions.[5] We believe this approach is grounded firmly in the EEOC regulations and the available medical literature. As such, we adopt it here.

## II. Application to This Case

### A. Gabriel Meets the Impairment Requirement

■ Gabriel has produced evidence sufficient for a reasonable juror to find that she suffered from an impairment at the time that her employer refused to accommodate and discharged her. *See Hershey v. Praxair, Inc.*, 969 F.Supp. 429, 433 (S.D.Tex.1997) ("the status of plaintiff's physical impairment must be viewed at the time of his discharge, when the allegedly discriminatory act took place.") Gabriel told both her supervisors that she suffered from back pain, stomach pain, and swelling that prevented long periods of standing and left her able to perform only light work. Dr. Chams' Disability Certificate confirmed that Gabriel was to be limited to light work only. Supervisor Meehan forced Gabriel to exceed these limitations, and, shortly afterward, Gabriel gave birth two months prematurely. We cannot say as a matter of law that these conditions—the back pain, stomach pain, and especially the premature birth—were functions of a normal pregnancy.

The JAMA article referenced in *Hernandez* states that the risk of premature birth is a "substantial complication" of pregnancy that "may be disabling for further work." *See Council on Scientific Affairs, Effects of Pregnancy on Work Performance*, 251 JAMA 1995, 1997 (1984). Moreover, *Hernandez* specifically held that pre-term labor is an impairment of the reproductive system

---

5. *See, e.g., Darian v. University of Massachusetts Boston*, 980 F.Supp. 77 (1997) (denying summary judgment because (1) plaintiff's severe pain and paralyzing uterine contractions were not the product of a normal pregnancy; (2) the limited duration of her condition did not preclude a finding of substantial limitation, but rather was only one factor to consider; and (3) her condition substantially limited her ability to participate in education); *see also Cerrato v. Durham*, 941 F.Supp. 388, 391–93 (S.D.N.Y.1996) (denying motion to dismiss because (1) plaintiff's alleged spotting, leaking, cramping, and dizziness may be the result of a reproductive system impairment; (2) the extent and severity of these limitations are fact questions that should not be resolved on a motion to dismiss; and (3) the

plaintiff's impairment may substantially limit the major life activity of work); *Garrett v. Chicago Sch. Reform Bd. of Trustees*, 1996 WL 411319 (N.D.Ill. July 19, 1996) (refusing to dismiss case because plaintiff's morning sickness may have substantially limited her ability to attend school, and holding that duration and severity of morning sickness could not be determined on a motion to dismiss); *Patterson v. Xerox Corp.*, 901 F.Supp. 274, 277–78 (N.D.Ill.1995) (denying motion to dismiss because (1) plaintiff's severe back pain resulting from a combination of pregnancy and a prior back injury is an impairment; (2) this impairment substantially limited her ability to sit at work for long periods; and (3) duration of impairment is impossible to tell at dismissal stage).

as a matter of law. Two other cases hold that back pain and morning sickness may constitute impairments of the reproductive system. *See Garrett v. Chicago Sch. Reform Bd. of Trustees,* 1996 WL 411319 (N.D.Ill. July 19, 1996); *Patterson v. Xerox Corp.,* 901 F.Supp. 274 (N.D.Ill.1995). We are loathe to play doctor by determining outright that Gabriel's physical condition was simply a normal function of pregnancy—especially in light of her premature labor and birth, which is certainly difficult to characterize as "normal." Drawing all inferences in favor of Gabriel, we find that a reasonable juror could conclude that Gabriel's back and stomach pain and premature birth were physiological disorders of the reproductive system.

We emphasize, however, that if Gabriel hopes to prevail at trial, she must present expert testimony on this issue. It would be extremely enlightening to hear from Dr. Chams, for example, on whether Gabriel's condition was the result of a normal pregnancy. It would also be helpful to have a non-treating obstetrician (or a similar expert) testify about what separates normal from unusual pregnancies, and when a particular condition can be considered a physiological disorder of the reproductive system.

### B. Gabriel's Condition Substantially Limited the Major Life Activity of Standing

■ Gabriel has also adduced evidence permitting a reasonable juror to find that her condition substantially limited a major life activity—standing. The EEOC's Interpretive Guidance makes clear that standing is a major life activity. 29 C.F.R. app. pt. 1630, § 1630(2)(i). Gabriel told both her supervisors that her back and stomach pains and swollen feet prevented her from standing for long periods of time. She testified that this condition persisted for six months of her seven-month pregnancy (from July 1995, when she first told Jezidija about it, until January 1996, six weeks after Gabriel had her baby). Under both the relevant case law and EEOC regulations, this evidence raises an issue of fact on the substantial limitation issue.

■ The term "substantially limited" means "significantly restricted as to the condition, manner and duration under which [the plaintiff] can perform a particular major life activity as compared to the condition, manner and duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j). In deciding whether Gabriel is substantially limited in her ability to stand, we must consider: (1) the nature and severity of her impairment; (2) the duration of her impairment; and (3) the long term impact of her impairment. *Id.* § 1630(j)(2). In *Latos v. County of Cook,* 1998 WL 142401 (N.D.Ill. Mar. 24, 1998), the plaintiff survived summary judgment by relying exclusively on her deposition testimony that her back and neck pain prevented "standing for long periods of time" and rendered her "substantially limited" in the length and time she could walk. The court held that this was sufficient evidence of a substantial limitation in the major life activity of walking. *Id.* at *3. This was so despite the fact that the plaintiff offered no expert testimony and did not elaborate at all on how far or how long she was able to walk. *Id.* Although that the plaintiff's evidence was "weak," the defendant had not produced any facts to the contrary, requiring a trial on the substantial limitation issue. *Id.*

Courts addressing whether a plaintiff's impairment substantially limits the major life activity of standing have likewise refused to make this determination as a matter of law. In *Hershey v. Praxair, Inc.,* 969 F.Supp. 429, 433 (S.D.Tex.1997), the court held that the trier of fact had to decide whether the plaintiff's restrictions on standing (among other things) substantially limited that activity:

> It cannot be ascertained from the medical records whether the limitations on these activities were severe enough to qualify Plaintiff as being unable to perform major life activities or significantly restricted in the performance of major life activities compared to the average person in society. These facts must be adduced at trial.

*Id.* Nor could the court make a definitive finding on duration—despite the fact that the plaintiff admitted he no longer suffered from physical limitations. *Id.* Similarly, the court in *Nieves v. Individualized Shirts,* 961 F.Supp. 782, 794 (D.N.J.1997), held the plaintiff's testimony that she experienced swelling

and occasional pain when standing for long periods of time was sufficient to create a fact issue as to whether she was substantially limited in the major life activity of standing. Even though her later testimony left doubt as to whether this limitation remained to the present, the court emphasized that "whether her condition 'substantially limits' her ability to stand [is] a question which is inappropriate for resolution on a summary judgment motion." *Id.*

In light of this authority, Gabriel's testimony that she could not stand for long periods of time throughout most of her pregnancy permits a finding that she was "significantly restricted as to the condition, manner and duration" of her ability to stand, as compared to the average person. *Latos* and *Nieves* confirm that the plaintiff's own testimony can create a fact question on this issue, and, along with *Hershey,* establish that the severity and duration of the impairment limiting major life activities are generally questions for the jury. In addition, there is independent evidence that Gabriel's impairment was severe—the fact that she gave birth two months prematurely alone supports this. The six-month duration of her back and stomach impairments supports a finding of substantial limitation as well. *See Hernandez,* 959 F.Supp. at 130 (finding substantial limitation even though plaintiff's impairment existed only during pregnancy); *Darian,* 980 F.Supp. 77, 86 & n. 20 (observing that plaintiff's impairments surfaced only during the "last phase of her pregnancy," but emphasizing that "the duration of an injury is relevant to its coverage under the ADA ... but, standing alone, is not dispositive."). Finally, the City has offered no evidence contradicting the plaintiff's testimony about the nature, severity, and duration of her impairments.

■ Although intermittent, episodic impairments are not considered disabilities under the ADA, *see Vande Zande v. Wisconsin Dep't of Admin.,* 44 F.3d 538, 544 (7th Cir. 1995), Gabriel's condition was not intermittent or episodic. Nor was it a "non-chronic impairment of short duration, with little or no long term or permanent impact." 29 C.F.R.App. § 1630.2(j). Her ailments began affecting her in July 1995 and did not subside until January 1996. These ailments extended beyond the time Gabriel gave birth, and

thus lasted even longer than the conditions suffered by the plaintiffs in *Hernandez* and *Darian.*

The cases cited by the City are all distinguishable from the facts here. The plaintiffs in these cases either tried to rely on pregnancy, by itself, as a disability—and thus presented no proof or even allegations of abnormal pregnancy-induced conditions—or were contradicted by their own treating physicians' testimony that their conditions were the result of normal pregnancies. *See, e.g., Gudenkauf v. Stauffer Communications, Inc.,* 922 F.Supp. 465, 474 (D.Kan.1996) (granting summary judgment because "[t]he medical evidence of record plainly establishes that Gudenkauf's pregnancy was not unusual or abnormal. The conditions she experienced with the pregnancy were not outside the normal range."); *Richards v. City of Topeka,* 934 F.Supp. 378, 380, 382 (D.Kan. 1996) (no allegations that plaintiff's pregnancy was unusual or abnormal); *Villarreal v. J.E. Merit Constructors, Inc.,* 895 F.Supp. 149, 152 (S.D.Tex.1995) (no evidence that pregnancy was abnormal); *Jessie v. Carter Health Care Ctr.,* 926 F.Supp. 613 (E.D.Ky. 1996) ("No unusual circumstances exist with respect to Jessie's pregnancy and thus such condition is not a 'physical impairment' under the ADA."). While the plaintiff in one case did develop an abnormal condition as a result of her pregnancy (ovarian cysts), there was no evidence that the cysts had any effect (much less put a substantial limitation) on any major life activities. *See Tsetseranos v. Tech Prototype, Inc.,* 893 F.Supp. 109 (D.N.H.1995). In contrast, Gabriel presents evidence that she suffered from conditions that may well be the result of abnormal reproductive functioning, and which substantially limited the major life activity of standing.

## CONCLUSION

Because Gabriel has presented evidence sufficient to create a genuine issue of material fact on all three components of the ADA's definition of disability, we deny the City's motion for summary judgment. We strongly urge Gabriel's counsel, however, to secure expert testimony on the issues discussed

above. The parties are ordered to attend a status hearing at 9:30 a.m. on August 3,1998 to set a fair and efficient schedule for trial.